11-1682-cv
Ellul et al. v. Christian Brothers

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: June 19, 2012     Decided: December 8, 2014)

Docket No. 11-1682-cv

EMMANUEL ELLUL, on behalf of himself and all others similarly situated,
VALERIE CARMACK, on behalf of herself and all others similarly situated,
HAZEL GOULDING, on behalf of herself and all others similarly situated,

*Plaintiffs - Appellants*,

— v. —

CONGREGATION OF CHRISTIAN BROTHERS, ORDER OF THE SISTERS OF MERCY,
CATHOLIC RELIGIOUS ORDER, DOES 1-10,

*Defendants - Appellees*,

MERCY INTERNATIONAL ASSOCIATION,

*Defendant*.[*]

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

1

B e f o r e:

CALABRESI, LYNCH, and LOHIER, *Circuit Judges*.

_____

Plaintiffs-appellants Emmanuel Ellul, Valerie Carmack, and Hazel Goulding sued the Congregation of Christian Brothers, the Order of the Sisters of Mercy, Mercy International Association, and various unnamed Catholic religious orders, alleging, inter alia, violations of the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").  The United States District Court for the Southern District of New York (Paul A. Crotty, *Judge*), granted defendants' motion to dismiss on various grounds, including that plaintiffs' claims were barred by the statute of limitations.  Because the bulk of plaintiffs' claims are no longer cognizable under the ATS as interpreted by the Supreme Court's recent decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013), and plaintiffs' remaining federal claims are barred by the statute of limitations, we affirm the dismissal of the complaint.

AFFIRMED.

_____

> NEAL DEYOUNG (H. Rajan Sharma *on the brief)*, Sharma & DeYoung LLP, New York, New York, *for plaintiffs-appellants* Emmanuel Ellul, Valerie Carmack, and Hazel Goulding.

2

TIMOTHY JAMES O'SHAUGHNESSY (Matthew W. Naparty *on the brief*), Mauro Lilling Naparty LLP, Great Neck, New York, *for defendant-appellee* Congregation of Christian Brothers.

THOMAS EDWARD WACK (Michael Gordon Biggers *on the brief*), Bryan Cave LLP, St. Louis, Missouri, *for defendant-appellee* Order of the Sisters of Mercy.

———————

GERARD E. LYNCH, *Circuit Judge*:

In Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013), the Supreme Court held that, with very limited exceptions, the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), does not apply extraterritorially to conduct that occurs outside the United States. 133 S. Ct. at 1665. The actions that form the basis of this case occurred far from the United States and many decades ago. It is beyond question – and defendants do not dispute – that plaintiffs allege shocking violations of internationally accepted norms. But it is also beyond question that, based on the Supreme Court's interpretation of the ATS, most of plaintiffs' claims are not cognizable in an American court. Plaintiffs' remaining federal claims that even arguably survive Kiobel are, in any event, barred by the statute of limitations. Accordingly, we affirm the district court's dismissal of plaintiffs' complaint.

3

## BACKGROUND[1]

Plaintiffs' claims stem from an alleged "child migration" program undertaken in the aftermath of World War II. As part of the scheme, the purpose of which was to populate Australia with "pure white stock" from Britain and "working boys" from Malta (Compl. ¶ 1), defendants allegedly took plaintiffs away from their families as children, falsely told them that their parents had died or abandoned them, and transported them to Australia, where plaintiffs and other children were made to work essentially as slaves, for long hours without pay, and were subjected to extreme physical and, in some cases, sexual abuse.

Emmanuel Ellul was born in Malta in 1946. At age fourteen, he and his brothers were sent to Australia as part of the child migration program. Ellul's parents were told that he would be educated in Australia, and that after his education was complete, he could return to Malta or the family could be reunited in Australia. Once in Australia, however, Ellul and his brothers were taken to an agricultural school run by the Congregation of Christian Brothers ("CCB"), a Roman Catholic religious order, where they were made to work on a large

---

[1] The following facts are taken from the allegations in the complaint, which we presume to be true at this stage of the proceeding. Dejesus v. HF Mgmt. Servs., LLC, 726 F.3d 85, 87 (2d Cir. 2013).

commercial farm and were not given any schooling. The children at the farm performed physical labor from early morning until nightfall, were frequently beaten and threatened with physical violence, and were told that their parents were dead. At age seventeen, Ellul was sent to another farm where he worked for a year. Ellul was never paid for any of his labor and he lost contact with his brothers for nearly two decades.

Valerie Carmack was born in Britain in 1943. When she was ten years old, her mother was told that Carmack had been adopted by another family in Britain, but in fact she had been sent to Australia. Once there, she was made to work at Nazareth House, a home for the elderly. For roughly six years, she worked long hours, seven days a week, for no pay. At age sixteen, Carmack was sent to work at a convent[2] where she was told that her wages were being kept for her "savings," but upon reaching the age of majority, she was not given those savings. (Id. ¶ 24.) After leaving Australia, Carmack returned to Nazareth House as an adult to obtain her birth certificate. She was then informed that "she might have a mother but . . . it would be pointless to contact her." (Id. ¶ 25.)

---

[2] Plaintiffs do not allege that this convent or Nazareth House was operated by any of the named defendants.

Carmack, who is now a U.S. citizen, made several attempts to locate information about what had happened to her, including a trip to Australia in 1993 during which she sought records about herself from government officials.

Hazel Goulding was sent from Britain to Australia in 1947 when she was eight years old. Like the other plaintiffs, she was made to work long hours for no pay and received virtually no education. She lived at an institution run by nuns who allegedly were part of the Order of the Sisters of Mercy ("OSM"). The nuns routinely beat and starved their wards, including Goulding. When Goulding was fifteen, she escaped the institution, but was caught and returned to the custody of OSM, after which she was kept in solitary confinement. In 1954, Goulding's family managed to track her down and she and her sister returned to Britain. She returned to Australia in 1970. Since then, she has sought public records about herself. She also testified about her personal experiences as part of an inquiry into the child migration program by the Australian Senate, which resulted in the 2001 release of a comprehensive report on the program (the "Senate Report"). See Commonwealth of Australia, Lost Innocents: Righting the Record - Report on child migration (Aug. 30, 2001), available at http://www.aph.gov.au/Parliamentary_Business/Committees/Senate/Community

6

_Affairs/completed_inquiries/1999-02/child_migrat/report/index.htm.

Plaintiffs brought this suit in the Southern District of New York on December 30, 2009. They brought claims against CCB, OSM, and various unnamed Catholic religious orders[3] under the ATS, alleging violations of customary international law including slavery and involuntary servitude, child trafficking, forced child labor, and cruel, inhuman, and degrading treatment or punishment, as well as common law claims of conversion, unjust enrichment, constructive trust, accounting, and breach of fiduciary or special duty.[4] Defendants moved to dismiss or for summary judgment.

On March 23, 2011, the district court granted defendants' motions and dismissed the complaint. Ellul v. Congregation of Christian Bros., No. 09 Civ. 10590(PAC), 2011 WL 1085325 (S.D.N.Y. Mar. 23, 2011). The court held that it did not have personal jurisdiction over CCB because CCB had never been properly

---

[3] The complaint also named Mercy International Association as a defendant, but plaintiffs voluntarily dismissed all claims against it.

[4] Carmack also separately asserted claims for violations of customary international law under 28 U.S.C. § 1331.

served.  Id. at *2.[5]  As to OSM, the district court found, based on the allegations in

the complaint and an affidavit submitted with OSM's motion, that OSM was not

a legal entity capable of being sued; rather, "OSM" was a loose term for nine

independent, autonomous regional organizations of nuns that all use the name

"Sisters of Mercy."  Id. at *3.[6]  Therefore, the district court dismissed all claims

against CCB and OSM.

In the alternative, the district court determined that the statute of

limitations barred plaintiffs' claims.  Following decisions from the Ninth Circuit

and another district court in the Southern District of New York, the court

borrowed the ten-year statute of limitations from the Torture Victim Protection

Act ("TVPA"), and applied it to the ATS claims.  Id. at *4, citing Papa v. United

---

[5] Rather than serving process on CCB's headquarters in Rome, plaintiffs had instead served a North American association of Christian Brothers that the district court found was a separate and distinct entity from CCB.  The district court also noted that all of the allegations in the complaint charged unlawful conduct by "Christian Brothers Oceania," which was itself a separate entity from either the Rome association or the North American association.  Ellul, 2011 WL 1085325, at *2.

[6] For essentially the same reason, the court also held that service on the North American Sisters of Mercy did not create personal jurisdiction over the Australian organization alleged to have committed the acts described in the complaint.  Id.

States, 281 F.3d 1004, 1012 (9th Cir. 2002), and Doe v. Karadzic, No. 93 Civ. 878(PKL), 2000 WL 763851, at *1 n.3 (S.D.N.Y. June 13, 2000). The court held that because the alleged conduct commenced more than sixty years ago, the statute of limitations had expired. Id. The court concluded that the various statutes of limitations for the pendent state common law claims had also run. Id. Finally, the court determined that neither the diligence-discovery rule nor the doctrines of equitable tolling and equitable estoppel saved plaintiffs' untimely claims. Id. at *4-*5.

Plaintiffs appealed. On appeal, defendants argued for the first time that our decision in Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), which held that ATS claims for violations of customary international law could not be brought against corporations, barred plaintiffs' ATS claims. After the parties' briefing, the Supreme Court granted certiorari in Kiobel, heard oral argument, and then ordered reargument on the question "[w]hether and under what circumstances the Alien Tort Statute . . . allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." Kiobel v. Royal Dutch Petroleum Co., 132 S. Ct. 1738 (2012). After that order, but before reargument in the Supreme

9

Court, we heard oral argument in this case. At oral argument, we questioned whether it would be advisable to wait until the Court rendered a decision in Kiobel, which might affect the viability of plaintiffs' claims based on conduct occurring abroad.

After Kiobel was finally decided, the parties submitted supplemental briefing on its impact. Plaintiffs conceded that Kiobel likely precluded some of their ATS claims, but argued that others survived the Supreme Court's decision. Pls.' Letter of May 10, 2013, ECF No. 169. After awaiting resolution of a number of other cases pending before this Court that also presented Kiobel issues and had precedence over this one, we now consider the district court's March 23, 2011 opinion and order, the parties' arguments on appeal, and the supplemental briefing in light of Kiobel.

## DISCUSSION

I.      Standard of Review

We review a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) de novo, accepting all factual allegations in the complaint as true. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). We may affirm on any ground that finds support in the record,

regardless of the grounds upon which the district court relied.  McCall v. Pataki, 232 F.3d 321, 323 (2d Cir. 2000).

II.     The ATS and the Supreme Court's *Kiobel* Decision

The ATS, passed in 1789, provides that the federal district courts "shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The Act has been "read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time" of passage.  Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004).  The Supreme Court has instructed, however, that courts may, proceeding cautiously, recognize ATS claims for violations of "the present-day law of nations" so long as the claims "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [that the Court has] recognized."  Id. at 725.  We assume without deciding that all of plaintiffs' ATS claims meet that standard.

In Kiobel, Nigerian nationals residing in the United States sued Dutch, British, and Nigerian corporations under the ATS, alleging that the corporations

11

aided and abetted the Nigerian government in committing numerous atrocities that violated the law of nations. 133 S. Ct. at 1662-63. All of the alleged violations of international law in Kiobel occurred in Nigeria. Id. Following reargument, the Supreme Court considered whether those claims should be examined through the lens of the presumption against extraterritoriality, which states that "when a statute gives no clear indication of an extraterritorial application, it has none." Id. at 1664 (internal quotation marks and alteration omitted).

The Court determined that the presumption applied to ATS claims. It rested that conclusion in part upon the three causes of action that were recognized as constituting violations of the law of nations when the ATS was passed: the violation of safe conducts, infringement on the rights of ambassadors, and piracy. Id. at 1666, citing 4 W. Blackstone, Commentaries on the Laws of Eng. 68 (1769). The first two violations concerned conduct occurring within the territory of the United States, while the third, piracy, occurred "on the high seas, beyond the territorial jurisdiction of the United States or any other country." Id. at 1667. The Court noted that pirates might be "a category unto themselves" since they were "fair game wherever found, by any nation, because they

generally did not operate within any jurisdiction." Id. Finding these examples of

violations of the law of nations consistent with the presumption against

extraterritoriality, the Court determined that the presumption applied to

international tort claims brought under the ATS, thus barring "petitioners' case

seeking relief for violations of the law of nations occurring outside the United

States." Id. at 1669.[7]

The Court left open the possibility that conduct outside the United States

could be covered by the ATS where the claims "touch and concern the territory of

the United States." Id. But "even where the claims touch and concern the

territory of the United States," the Court cautioned, "they must do so with

sufficient force to displace the presumption against extraterritorial application."

---

[7] Justice Breyer, joined by three other justices, concurred in the judgment. Unlike the Court, he would not have invoked the presumption against extraterritoriality. Rather, he would have established a multi-factor test whereby jurisdiction is conferred if:

> (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind.

Id. at 1671 (Breyer, *J.*, concurring in the judgment).

13

Id. The conduct of the corporate defendants in Kiobel did not meet that test, according to the Supreme Court, because "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices." Id.

III.    Plaintiffs' ATS Claims and Extraterritoriality

Plaintiffs concede that Kiobel could be read to bar those of their ATS claims that stem from conduct that occurred entirely within the territory of Australia. Pls.' Letter of May 10, 2013, ECF No. 169, at 7 ("The claims for forced labor, slavery and involuntary servitude as well as for cruel, inhuman[] and degrading treatment or punishment are likely precluded under . . . Kiobel."). However, they argue that Kiobel should not be read so broadly, and contend that their claims survive that decision because both defendants have a "substantial nexus . . . to the United States." Id. Moreover, they argue that even if read broadly to preclude most of their ATS claims, Kiobel by its own terms does not reach their human trafficking claim,[8] which alleges a transnational violation of international

---

[8] Plaintiffs characterized this claim in the complaint as one of "child trafficking," but now refer to it as "human trafficking." There does not appear to be any material distinction between the two.

14

law not occurring within the exclusive jurisdiction of any sovereign.  Id. at 3-4.[9]

Plaintiffs base their "substantial nexus" argument on the fact that defendants "were at all times unincorporated associations, and, while committing the alleged wrongs, maintained a substantial presence and significant operations in the United States."  Id. at 7.  Although Kiobel provides no "substantial nexus" exception to the presumption against extraterritoriality, plaintiffs' argument essentially contends that their claims "touch and concern" the territory of the United States, and therefore might overcome the presumption in the manner the Supreme Court recognized.  See 133 S. Ct. at 1669.

Even so construed, however, plaintiffs' claims fail to meet the Court's standard.  Kiobel rejected the notion that a defendant's mere presence in the United States is sufficient to displace the presumption against extraterritoriality.  See id. ("[I]t would reach too far to say that mere corporate presence suffices.").[10]

_____

[9] Carmack argues that her claims survive Kiobel because she is a U.S. citizen and may therefore assert claims for violations of customary international law pursuant to 28 U.S.C. § 1331.  Pls.' Letter of May 10, 2013, ECF No. 169, at 6-7.  However, to the extent that § 1331 might provide an alternative jurisdictional basis for Carmack's claims – a question we need not decide – they fail on statute of limitations grounds for the reasons discussed below.

[10] Justice Breyer's concurrence similarly provides no support for finding a corporate defendant's presence in the United States sufficient to provide ATS

15

And we have explicitly held since <u>Kiobel</u> that even the citizenship of the defendant is irrelevant to jurisdiction to hear claims under the ATS. <u>See</u> <u>Mastafa v. Chevron Corp.</u>, 770 F.3d 170, 188 (2d Cir. 2014); <u>Balintulo v. Daimler AG</u>, 727 F.3d 174, 189 (2d Cir. 2013). Therefore, plaintiffs' "substantial nexus" argument fails to preserve their ATS claims for slavery and involuntary servitude, forced child labor, and cruel, inhuman, and degrading treatment or punishment, all of which are based on actions that took place entirely in Australia.[11]

Accordingly, following the Supreme Court's controlling precedent, we hold that plaintiffs' claims under the ATS for violations of international law that occurred in Australia, that is to say, all except plaintiffs' claim for human trafficking, must be dismissed as extraterritorial applications of the ATS.

Plaintiffs' sole remaining ATS claim is for human trafficking. They argue that human trafficking is transnational in nature and does not occur within the

jurisdiction. <u>See</u> <u>id</u>. at 1671 (Breyer, *J.*, concurring in the judgment) (arguing for jurisdiction where "defendant is an American *national*" (emphasis added)).

[11] Carmack also argues that her claims "have a strong nexus to the United States in any event based upon her citizenship." Pls.' Letter of May 10, 2013, ECF No. 169, at 6. But to the extent that Carmack seeks to ground jurisdiction on the ATS, her citizenship defeats rather than grounds such jurisdiction. As noted above, the ATS grants jurisdiction over civil actions brought "by an alien." 28 U.S.C. § 1350.

16

exclusive territory of a single foreign sovereign.  In this case, for example, the trafficking may have begun in Britain and Malta and ended in Australia, but it also encompassed plaintiffs' transportation from Europe to Australia on the high seas.  Therefore, plaintiffs contend, human trafficking, like piracy, does not take place exclusively within the jurisdiction of a foreign state and thus, like piracy, falls outside the presumption against extraterritoriality.  See Pls.' Letter of May 10, 2013, ECF No. 169, at 3-4.  We need not decide whether human trafficking claims remain cognizable in U.S. courts after Kiobel, however, because plaintiffs' trafficking claim is barred by the statute of limitations.

IV.    Plaintiffs' Human Trafficking Claim and the Statute of Limitations[12]

The ATS does not specify a statute of limitations.  In the absence of a limitations period prescribed by statute, federal courts typically borrow the local state statute of limitations unless "a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes."  N. Star Steel Co. v. Thomas, 515 U.S. 29, 35 (1995) (internal quotation marks omitted).  Several of our

---

[12] Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

17

sister circuits have found such an analogy for ATS claims in the TVPA, which provides a ten-year statute of limitations.  See Chavez v. Carranza, 559 F.3d 486, 492 (6th Cir. 2009); Jean v. Dorelien, 431 F.3d 776, 778-79 (11th Cir. 2005); Van Tu v. Koster, 364 F.3d 1196, 1199 (10th Cir. 2004); Papa, 281 F.3d at 1012-13.[13]  We have not decided whether the TVPA's ten-year statute of limitations applies to all or any specific claims under the ATS, and we need not decide that question here.  Because the parties agree that a ten-year statute of limitations applies to plaintiffs' ATS claims, see Pls.' Br. 43; CCB Br. 31-32; OSM Br. 15, we assume without deciding that the limitations period for the human trafficking claim is ten years.[14]

_____

[13] District courts within our Circuit have similarly applied the ten-year limitations period from the TVPA.  See Sikhs for Justice v. Nath, 893 F. Supp. 2d 598, 627 (S.D.N.Y. 2012); Shan v. China Constr. Bank Corp., No. 09 Civ. 8566(DLC), 2010 WL 2595095, at *2 n.8 (S.D.N.Y. June 28, 2010); Jesner v. Arab Bank, PLC, No. 06-CV-3869 (NG)(VVP), 2009 WL 4663865, at *3 (E.D.N.Y. May 1, 2009); In re S. African Apartheid Litig., 617 F. Supp. 2d 228, 288 (S.D.N.Y. 2009); Javier H. v. Garcia-Botello, 239 F.R.D. 342, 346 (W.D.N.Y. 2006); Manliguez v. Joseph, 226 F. Supp. 2d 377, 386 (E.D.N.Y. 2002); Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386(KMW), 2002 WL 319887, at *19 (S.D.N.Y. Feb. 28, 2002); Karadzic, 2000 WL 763851, at *1 n.3.  But see In re "Agent Orange" Prod. Liab. Litig., 373 F. Supp. 2d 7, 63 (E.D.N.Y. 2005) (suggesting that no statute of limitations applies to ATS claims).

[14] Similarly, we assume that a ten-year statute of limitations applies to all of Carmack's claims.  While plaintiffs' concession that the ten-year statute of

Given that assumption, plaintiffs' human trafficking claim is untimely. The complaint makes plain that the actions allegedly constituting trafficking took place more than fifty years ago, when plaintiffs were transported from their homes in Europe to Australia. Consequently, for plaintiffs' claim to be considered within the limitations period, plaintiffs must demonstrate that they did not discover their cause of action – and *could not* have discovered it with due diligence – until less than ten years before bringing suit. See Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007) (noting that under the "[diligence-]discovery rule, . . . a plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, the injury that is the basis of the litigation"). Plaintiffs argue that the release of the Senate Report in 2001 was the triggering event that allowed them to discover their cause of action. That argument is undermined, however, by the allegations in the complaint, which make clear that, at least by the time plaintiffs reached the age of majority, each of them knew that he or she had been abducted from his or her family, imprisoned, abused,

---

limitations from the TVPA applies to their claims is worded in terms of claims brought under the ATS, there is no suggestion in their briefing, let alone an argument, that a different limitations period applies to Carmack's substantively identical international law claims purportedly brought under § 1331.

19

forced to work for no pay, and not provided any education. Both Carmack and Goulding returned to Australia as adults to investigate what had happened to them – at the latest in the early 1990s. Goulding in fact testified before the committee that subsequently authored the Senate Report.

Nevertheless, plaintiffs argue that the Senate Report revealed two crucial facts that were not known to them before 2001: first, that defendants used fraud or deceit to take plaintiffs from their families and transport them to Australia, and, second, that defendants were obligated under indentures between themselves and the Australian government to hold plaintiffs' wages in trust for them. Those facts are significant, according to plaintiffs, because without them, they could not make out the elements of a human trafficking claim that (a) they were transferred from their parents' custody "by means of the threat or use of force or other forms of coercion, fraud, or deception" and (b) their transfer was "for the purpose of exploitation." Pls.' Br. 47.

We need not here discuss in detail what is sufficient to put plaintiffs on notice under the diligence-discovery rule. Even if that rule required that plaintiffs know that defendants would be liable under a particular cause of action, which is dubious, see Rotella v. Wood, 528 U.S. 549, 555 (2000); United States v. Kubrick, 444 U.S. 111, 122-23 (1979); A.Q.C. ex rel. Castillo v. United

20

States, 656 F.3d 135, 142 (2d Cir. 2011); Valdez ex rel. Donely v. United States, 518 F.3d 173, 178 (2d Cir. 2008), here plaintiffs *were* aware of all the necessary elements of a cause of action for human trafficking long before the Senate Report was released in 2001.

Ellul alleged that he was taken from his family on the promise that he would be educated and then reunited with them when he turned eighteen. As he well knew at the time he came of age, neither promise had been fulfilled. Carmack was told when she returned to Australia as an adult that, contrary to what she had previously been told, her mother might be alive. Goulding's family tracked her down and engineered her return to Britain. All the plaintiffs were therefore aware years before the Senate Report that defendants effected their transfer to Australia through some sort of deception or abusive tactic. See Velez v. Sanchez, 693 F.3d 308, 323 (2d Cir. 2012) (noting that, in addition to deception, human trafficking can also be accomplished by means of "the abuse of power or of a position of vulnerability" (quoting Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children—Annex II to the United Nations Convention Against Transnational Organized Crime ("Palermo Protocol"), art. 3, G.A. Res. 55/25, U.N. Doc. A/RES/55/25 (Jan. 8, 2001)).

21

As to the exploitation element, international law, as stated in the Palermo Protocol, defines exploitation to include "at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs." Id., quoting Palermo Protocol, art. 3. The complaint alleges that all of the plaintiffs were forced to work long hours and were not paid for their labor, something of which the plaintiffs obviously were well aware when it occurred and continued to be aware after achieving majority. Plaintiffs therefore knew that they had been exploited decades before the issuance of the Senate Report. While knowledge of the indentures between defendants and the Australian government might have made plaintiffs aware that their unpaid labor violated *Australian* law, it is irrelevant to exploitation under *international* law, which turns solely on the practice of slavery or forced labor, not on whether such practice violated promises made to the Australian government. Accordingly, plaintiffs were aware of all of the elements of a human trafficking claim more than ten years before they filed this lawsuit.[15]

_____

[15] As noted above, see supra n.14, we assume, based on plaintiffs' concession, that all of Carmack's claims are governed by the ten-year statute of limitations regardless of their jurisdictional basis. Since we hold that plaintiffs knew of their injuries decades before the release of the Senate Report, Carmack's claims for

Plaintiffs argue that even if their claims accrued before the release of the Senate Report, we should equitably toll the statute of limitations because of the extraordinary circumstances of this case and because defendants fraudulently concealed the causes of action.[16] "Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012) (internal quotation marks omitted). Equitable tolling is "applicable only in rare and exceptional circumstances," where it is necessary "as a matter of fairness." Phillips v. Generations Family Health Ctr., 723 F.3d 144, 150 (2d Cir. 2013) (internal quotation marks omitted). To qualify for equitable tolling, a

---

slavery and involuntary servitude, forced child labor, and cruel, inhuman, and degrading treatment or punishment, as well as her claim for human trafficking, are untimely, even if not barred by Kiobel.

[16] We assume without deciding that the doctrines of equitable tolling and equitable estoppel are available in connection with the statute of limitations that plaintiffs agree applies to their claims.

plaintiff must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in [the] way" of his bringing a lawsuit.  A.Q.C., 656 F.3d at 144 (internal quotation marks omitted).

The distinction between equitable tolling and the diligence-discovery rule has not always been clear in our caselaw.  "Our Court has used 'equitable tolling' to mean [both] fraudulent concealment of a cause of action that has in some sense accrued earlier, and to mean fraudulent concealment that postpones the accrual of a cause of action."  Pearl v. City of Long Beach, 296 F.3d 76, 82 (2d Cir. 2002) (internal quotation marks and citation omitted).  The distinction is that the diligence-discovery rule *delays* the date of accrual where the plaintiff "is blamelessly ignorant of the existence or cause of his injury," Barrett v. United States, 689 F.2d 324, 327 (2d Cir. 1982), while the doctrine of equitable tolling applies *after* the claim has already accrued, suspending the statute of limitations "to prevent unfairness to a diligent plaintiff," Haekal v. Refco, Inc., 198 F.3d 37, 43 (2d Cir. 1999).

The basis for plaintiffs' claim of equitable tolling here is two-fold: first, they point to their allegation, substantiated by the Senate Report, that defendants destroyed or otherwise withheld documents related to the child migration

24

program; second, they argue that defendants acted as plaintiffs' guardians *in loco parentis* and as fiduciaries with respect to plaintiffs' wages held in trust. But, as just discussed in the context of accrual, plaintiffs possessed the necessary information to bring a human trafficking claim well before the ten-year period preceding the filing of the complaint. Defendants' concealment thus did not prevent them from discovering their cause of action. See Koch, 699 F.3d at 157. Nor have plaintiffs identified what previously concealed information was ultimately revealed so as to allow plaintiffs' counsel finally to file this lawsuit, besides the information in the Senate Report, which we have determined to be unnecessary to plaintiffs' claims. We are similarly unpersuaded that defendants' acting *in loco parentis* or as fiduciaries of plaintiffs' wages would toll the statute of limitations beyond the date that plaintiffs attained the age of majority.[17] See Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 446 (S.D.N.Y. 2014) ("[E]ven assuming the in loco parentis relationship had the transformative effect upon the passive concealments and generalized misstatements asserted by the plaintiffs, any such relationship between the schools and the students ceased at the very

---

[17] Ellul, the youngest of the plaintiffs, turned twenty-one in 1967, more than forty years before this lawsuit was filed in 2009.

latest when the students left or graduated."), aff'd, 579 F. App'x 7 (2d Cir. 2014)

(summary order). Though the facts of this case are no doubt extraordinary in the

sense that the abuses alleged are both unusual and egregious, they are not

extraordinary in any way that would affect plaintiffs' ability to have inquired

into and discovered the relevant facts long before 2001.

Finally, plaintiffs argue that defendants should be equitably estopped from

asserting a statute of limitations defense. "Unlike equitable tolling, which is

invoked in cases where the plaintiff is ignorant of his cause of action because of

the defendant's fraudulent concealment, equitable estoppel is invoked in cases

where the plaintiff knew of the existence of his cause of action but the

defendant's conduct caused him to delay in bringing his lawsuit." Cerbone v.

Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 49-50 (2d Cir. 1985).[18]

Equitable estoppel applies in cases where, for example, the defendant lulls the

plaintiff into not filing suit with assurances that she will settle the case. Id. at 50.

To invoke equitable estoppel, a plaintiff must show that: "(1) the defendant made

a definite misrepresentation of fact, and had reason to believe that the plaintiff

---

[18] As defendants point out, this distinction makes the application of equitable
tolling and equitable estoppel mutually exclusive, though of course they can be
argued in the alternative.

would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995). Plaintiffs reiterate their arguments that defendants deceived them and their families in transporting them to Australia and then fraudulently concealed information about their histories, but do not assert that defendants made any misrepresentations that caused them to delay bringing this lawsuit once the facts became or should have become known to them. We therefore perceive no basis in the record for applying equitable estoppel.

Accordingly, plaintiffs' sole arguably remaining claim under the ATS for human trafficking, and any claim of Carmack's for which jurisdiction arguably may be premised under 28 U.S.C. § 1331, are barred by the statute of limitations that plaintiffs agree applies to their case. For the same reasons, the district court correctly dismissed plaintiffs' state common law claims, all of which have a limitations period shorter than ten years.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.