An appropriate Order will follow.

ESTATE OF Arturo Giron ALVAREZ, et al., Plaintiffs

v.

The JOHNS HOPKINS UNIVERSITY, et al., Defendants

CIVIL ACTION NO. MJG–15–950

United States District Court, D. Maryland.

Signed 08/30/2017

Paul D. Bekman, Elijah Dale Adkins, III, Emily Claire Malarkey, Gregory Gene Hopper, Ryan. S. Perlin, Laurence A. Marder, Salsbury Clements Bekman Marder and Adkins LLC, Baltimore, MD, Floyd Ronald Jenkins, Matthew Robert Caton, Meridian 361 International Law Group PLLC, Portland, ME, for Plaintiffs.

Robert J. Mathias, DLA Piper US LLP, Lauren Schultz Colton, Scott R. Haiber, Hogan Lovells US LLP, Christopher M. Corchiarino, James A. Frederick, Linda S. Woolf, Goodell DeVries Leech and Dann LLP, Baltimore, MD, Gregory L. Diskant, Robert P. Lobue, Patterson Belknap Webb and Tyler LLP, New York, NY, Joseph Sedwick Sollers, III, Ashley Parrish, Daniel C. Sale, Paul Alessio Mezzina, King and Spalding LLP, Washington, DC, for Defendants.

## DECISION RE: THIRD AMENDED COMPLAINT

Marvin J. Garbis, United States District Judge

The Court has before it Defendants' Motion Under Federal Rules of Civil Procedure 12(b)(1) and (6) to Dismiss the Third Amended Complaint [ECF No. 133] and the materials submitted relating thereto. The Court has held a hearing and had the benefit of the arguments of counsel.

## I. BACKGROUND [1]

As set forth in the Decision Re: Second Amended Complaint [ECF No. 122], there is no doubt that, in or about 1946 to 1953, researchers in the United States Public Health Service, the Pan–American Sanitary Board, and the Guatemalan government engaged in nonconsensual human experimentation in Guatemala. The experimenters directly infected Guatemalan children, prisoners, soldiers, psychiatric patients, and commercial sex workers with syphilis without their consent or knowledge as part of the "Guatemala Experiments," a Sexually Transmitted Disease research experiment. The experimentation was concealed by the perpetrators and came to light only in 2010.

The 842 Plaintiffs are Guatemalans who allege that they are direct victims of this nonconsensual human experimentation who were personally infected with syphilis in the experimentation or indirect victims harmed as a consequence of the infection of a direct victim. In this action, Plaintiffs seek to impose liability on seven Defendants, the Johns Hopkins Defendants,[2] the Rockefeller Foundation, and Bristol-Myers Squibb Company.

By the Decision Re: Second Amended Complaint, the Court dismissed the Second Amended Complaint [ECF No. 100] but permitted Plaintiffs to file the Third Amended Complaint to assert claims under the law of Guatemala and the Alien

---

1. For background regarding the Guatemala Experiments and pertinent prior litigation, see the discussion in this Court's Decision Re: Second Amended Complaint [ECF No. 122].

2. Johns Hopkins Hospital, Johns Hopkins University, Johns Hopkins University School of Medicine, Johns Hopkins Bloomberg School of Public Health, the Johns Hopkins Health System Corporation, (collectively "Johns Hopkins" or "Hopkins").

Tort Statute. Plaintiffs' Third Amended Complaint ("TAC") [ECF No. 127] asserts claims in two Counts:

Count I: Tortious Violation of Well Established and Customary Norms of International Law—The Prohibition Against Nonconsensual Human Experimentation and Crimes Against Humanity, pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 ("the ATS claims").

Count II: Claim for Damages under Section 2277 of the 1933 Guatemalan Civil Code and Sections 1645–1646 of the 1963 Guatemalan Civil Code ("the Guatemalan law claims").

By the instant Motion, all Defendants seek dismissal of all claims against them.

## II. DISMISSAL STANDARDS

### A. Rule 12(b)(6)(Adequacy of Pleading)

██ A motion to dismiss filed under Federal Rule [3] of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

██ When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice." Id. A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to

relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955).

██ Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Thus, if the well-pleaded facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

### B. Rule 12(b)(1) (Subject Matter Jurisdiction)

██ A party may seek dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). It is well established that "[t]he burden of proving subject matter jurisdiction on a [Rule 12(b)(1) ] motion to dismiss is on the plaintiff, the party asserting jurisdiction." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). If a defendant contends "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based[,] ... all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Id.

## III. DISCUSSION

### A. Procedural Background

The instant case, the second one filed by alleged victims of the Guatemala Experiments,[4] was filed in the Circuit Court for

---

3. All "Rule" references herein are to the Federal Rules of Civil Procedure.

4. Subjects of the Guatemala Experiments originally filed a class action in 2011, asserting claims against federal officials under the

Baltimore City on April 1, 2015, and properly removed to this federal court pursuant to 28 U.S.C. § 1332(d)(11)(B)(i). [ECF No. 1].

On June 30, 2015, Plaintiffs filed the eleven-Count Amended Complaint [ECF No. 64], which included claims under Maryland law, an ATS claim, and punitive damages on all other claims. Defendants moved to dismiss all claims as time-barred. [ECF No. 63]. The Court dismissed all of the Maryland law claims and allowed Plaintiffs to submit a Second Amended Complaint. See Order Re: Second Amended Compl. [ECF No. 89].

The Second Amended Complaint [ECF No. 100] asserted claims in twenty Counts, including claims under Guatemalan law, Maryland law, and Alien Tort Statute claims. Defendants moved to dismiss all claims in the Second Amended Complaint [ECF No. 107]. The Court dismissed the Second Amended Complaint, but permitted Plaintiffs to file a Third Amended Complaint. See Decision Re: Second Amended Compl. [ECF No. 122].

In the Decision Re: Second Amended Complaint, the Court stated that "[t]o plead their claims adequately, Plaintiffs must present sufficient factual allegations regarding (1) 'foundationally,' [5] their individual abilities to present the claims asserted, (2) the existence of claims that, if timely made and adequately pleaded against an appropriate defendant, could be legally cognizable, and (3) the liability of the Defendants." [ECF No. 122] at 10.

On December 9, 2016, Plaintiffs filed the TAC. Subsequently, Defendants filed the instant Motion to Dismiss the Third Amended Complaint [ECF No. 133] seeking dismissal of all claims against them.

## B. The Third Amended Complaint [6]
### 1. The Plaintiffs

The 842 Plaintiffs are all Guatemala citizens and residents, one of which has dual United States citizenship.[7]

In the Decision Re: Second Amended Complaint, the Court directed Plaintiffs "to provide such adequate foundational allegations for at least one Plaintiff in each of the following categories:

1. Living Direct Plaintiffs
2. Estates of Direct Plaintiffs
3. Spouses of Direct Plaintiffs
4. First Generation Descendants (children)
5. Subsequent Generation Descendants
6. Wrongful Death Claimants."

[ECF No. 122] at 15.

The TAC divides the Plaintiffs into the following categories:

Category 1 "Direct Plaintiffs": [8] Guatemalans who were unknowingly, and

---

ATS and the U.S. Constitution. See Garcia v. Sebelius, 867 F.Supp.2d 125 (D.D.C. 2012), vacated in part, 919 F.Supp.2d 43 (D.D.C. 2013). The Garcia court converted the ATS claims into Federal Tort Claims Act claims, substituted the United States as a defendant, and dismissed all claims pursuant to an exception provided by 28 U.S.C. § 2680(k). Id. at 137.

**5.** Footnote in original: The term "foundation" is used herein to mean, as to a particular Plaintiff, specific individualized factual allegations to present a plausible claim arising out of the Guatemala Study that the Plaintiff could assert if it were timely filed against a defendant who could be held liable.

**6.** The "facts" stated herein are as alleged by Plaintiffs in the Third Amended Complaint and are not necessarily agreed to by Defendants.

**7.** Ramiro Aníbal Galvez Ortiz, Plaintiff No. 76, is alleged to be a dual citizen of the United States and Guatemala.

**8.** Francisco Garcia Alvarez, Ramiro Galvez Villalobos, Margarita Mendoza Gonzalez, and Carlos Alberto Mendoza.

without their consent, infected with syphilis as part of the Guatemala Experiments.

Category 2 "Spouses":[9] Guatemalans who did not have syphilis before he or she married or had sexual contact with a Direct Plaintiff, and who was infected with the disease through sexual contact with the Direct Plaintiff.

Category 3 "Children":[10] the sons and daughters of a Direct Plaintiff or the spouse of the son or daughter of a Direct Plaintiff and Spouse.

Category 4 "Grandchildren":[11] the grandchildren or great-grandchildren of a Direct Plaintiff.

Category 5 "Wrongful Death Plaintiffs":[12] the Parent, Spouse or Child of a Deceased Plaintiff who died as a result of syphilis acquired as a result of the Guatemala Experiments.[13]

Category 6 "Estate Plaintiffs":[14] Estates of Guatemalans who died as a result of syphilis acquired as a result of the Guatemala Experiments. The claims of all of these "Estate Plaintiffs" are being brought by their heirs, next of kin, or personal representatives.

The TAC identifies specific "Representative Plaintiffs" within each category, stating (1) the type of sexually transmitted disease ("STD") they each have, (2) their experience as subjects of the Guatemala Experiments or their relationship to a subject, (3) when they began to notice symptoms of syphilis, (4) when they were diagnosed with syphilis, (5) when they knew the cause of their disease, and (6) the dates of deaths of decedents, if relevant.

## 2. The Defendants

### a. Johns Hopkins

The Hopkins Defendants are Maryland entities with their principal place of business in Baltimore, Maryland. Johns Hopkins employed various individuals who served on the Syphilis Study Section, an advisory panel to the United States Public Health Service ("PHS") that authorized and oversaw the Guatemala Experiments. The TAC alleges that five senior Hopkins physicians were involved in the Experiments; they are Dr. J. Earle Moore, Dr. Lowell Reed,[15] Dr. Thomas Turner, Dr. Lewis Weed, and Dr. Harry Eagle.

### b. Rockefeller Foundation

The Rockefeller Foundation ("Rockefeller") is a New York corporation whose stated mission has been to "promote national and international research in the

9. Graciela Ortiz de Galvez, Alba Violeta Echevarria, and Berta Villatoro de Mendoza.

10. . Ebelin Galvez Ortiz, Lesbia Lucila Giron Galindo, Guillermo Caal Pop, and Victor Vicente Catun Coy.

11. Ronald Roberto Benavente Galvez, Katarin Elisabet Benavente Galvez, Cristian Josue Giron Galindo, Yngrid Yanete Rivera Giron, and Cristian Josue Catun Tzul.

12. Francisco Garcia Alvarez, Alva Violeta Echevarria, Lesbia Lucila Giron Galindo, Guillermo Caal Pop, Antonio Caal Pop, Aurelia Caal Pop, Victor Vicente Catun Coy, and Ambrocio Fidel Catun Coy.

13. All Wrongful Death Plaintiffs are also members of Categories 1, 2, 3, 4, and/or 6.

14. The TAC identifies the names of certain deceased individuals and alleges that the "Estate[s] of" those individuals are Estate Plaintiffs, but the TAC does not name the representatives of those Estates, except for the lead Plaintiff, Estate of Arturo Giron Alvarez by and through Maria Ana Giron Galindo as Administrator.

15. In 1950, Dr. Reed became President of Johns Hopkins.

area of public health." ¶ [16] 210. Throughout the 1940s, Rockefeller funded and carried out several public health projects throughout Central and Latin America.

The TAC alleges that certain Rockefeller employees and board members were involved in the Guatemala Experiments, including Dr. Thomas Parran, Dr. Frederick Soper, and Dr. George Strode. Dr. Parran was also a member of the Public Health Service and was employed as the United States Surgeon General from the mid-1930s to 1949. Dr. Soper served as a Director of the Pan American Sanitary Board [17] ("PASB") and as the "Responsible Investigator" during the Experiments.

c. Bristol–Myers Squibb Company

Bristol–Myers Squibb Company ("Bristol–Meyers Squibb" or "Bristol") is an entity incorporated under the laws of Delaware with its principal place of business in New York. It is the successor of Bristol Laboratories and E.R. Squibb & Sons, Inc.'s Squibb Institute for Medical Research, which provided penicillin for use in the Guatemala Experiments. The TAC alleges that four corporate officers of Bristol–Myers Squibb's predecessors were involved in the Guatemala Experiments; they were Dr. Oskar Wintersteiner, Dr. Geoffrey Rake, Dr. Arthur Richardson, and Dr. Delmas Kitchen. There is no allegation that any of these men were serving in any Government position pertinent to the Experiments.

3. STD Research in the 1930s and 1940s

The TAC alleges that Johns Hopkins and Rockefeller were heavily involved in STD research from the 1910s through the 1950s. In 1914, Rockefeller helped establish "Department L," a Hopkins clinic and research center focused on syphilis, which eventually came to be led by Dr. Moore, a Hopkins professor and also a member of the Rockefeller Foundation. By the 1930s, Hopkins controlled almost all syphilis research conducted in the United States. ¶¶ 269, 272, 274.

In the 1930s and 1940s, Dr. Parran, Dr. Moore, and others at Hopkins, with funding and personnel support from the PHS and its Subcommittee on Venereal Diseases, carried out two infamous human experiments—the Tuskegee and Terre Haute Studies. In the Tuskegee Study, the researchers found poor, African–American sharecroppers already infected with syphilis, and deceived those men about their condition so that the researchers could test and observe the effects of untreated syphilis in humans. ¶ 168. In the Terre Haute Study, researchers intentionally infected federal prisoners with gonorrhea, with the prisoners' consent, in order to test various treatment options. ¶ 170. After these studies, Dr. Moore, Dr. Parran, and others wanted to continue studying STDs in humans, but the pertinent rules and conditions in the United States regarding scientific experiments on humans prevented them from easily doing so in this country.

4. The Guatemala Experiments [18]

The TAC alleges that in 1946, Drs. Moore and Parran devised a plan to con-

---

**16.** All "¶" references herein refer to paragraphs of the TAC.

**17.** The Pan American Sanitary Board (also known as the "Pan–American Sanitary Bureau") is a quasi-public international health organization, established in 1902 to serve as the regional arm of the World Health Organization operating in the Americas. The PASB is now known as the Pan American Health Or-

ganization. See James Patrick Kiernan, 1902—2002: 100 Years of Panamericanism, 6 Perspectives in Health, no. 2, 2002, http://www1.paho.org/English/DD/PIN/Number12_article3_1.htm.

**18.** This characterization of the Guatemala Experiments is based upon the TAC and is disputed by Defendants.

duct syphilis research in Guatemala as a continuation of the Tuskegee and Terre Haute Studies. These men developed a research protocol to test penicillin as a cure or prophylaxis for syphilis. ¶¶ 174, 362. The study required a large human test group with secret, nonconsensual testing. Guatemala was chosen as the location for the Experiments because Johns Hopkins and Rockefeller had established relationships with Guatemalan officials, the intended test subjects were poor and uneducated, and it would be possible to conceal the study from the American and Guatemalan public. ¶¶ 366–369. Several individuals, referred to in the TAC as the "control group," were informed of the plan. ¶¶ 437, 441. The control group included, among others, Drs. Moore, Weed, Reed, Turner, and Eagle from Hopkins, Dr. Wintersteiner from Squibb, and Drs. Parran and Strode from Rockefeller. ¶¶ 360, 441.

The control group introduced the plan to the Syphilis Study Section, which was made up of the members of the former PHS Subcommittee on Venereal Diseases and the Penicillin Panel. ¶¶ 381–384. At the time, Drs. Reed, Turner, and Eagle from Hopkins, and Dr. Wintersteiner from Squibb were on the Board of the Syphilis Study Section, which was chaired by Dr. Moore of Hopkins. The Section met at Hopkins and acted as an " 'autonomous body, to which the PHS provided liaison and administrative support, but not control.' Only the academic and non-governmental researchers had voting privileges." ¶ 361. The Board of the Syphilis Study Section agreed to fund and conduct the Experiments in Guatemala with Government money. ¶ 385. However, the people in the Study Section who were outside of the "control group" were not informed and did not know that the Experiments were designed to be nonconsensual. This fact was concealed from them.

Dr. Moore, Dr. Parran, and Dr. Wintersteiner selected Dr. John Cutler, a PHS researcher who was involved in the Tuskegee and Terre Haute Studies, to lead the Guatemala Experiments. Dr. Soper, an Associate Director of Rockefeller's International Health Division, was selected to be the "Responsible Investigator" for the Guatemala Experiments. ¶¶ 393–395. The Responsible Investigator position entailed overseeing the actions of Dr. Cutler and protecting the rights and well-being of the test subjects. Dr. Soper did not have any STD research experience, but was chosen because he would allow the tests to be nonconsensual and would conceal the true nature of the Experiments. ¶ 394. The Rockefeller Foundation assigned Dr. Soper to the PASB to carry out his duty as Responsible Investigator. ¶ 395.

From 1946 through the 1950s, Dr. Cutler and his staff intentionally infected prison inmates, psychiatric patients, orphans, school children, soldiers, and others with syphilis, either through contact with sex workers or through direct injection. ¶ 408. Available records establish that the perpetrators of the Guatemala Experiments intentionally infected at least 1,308 Guatemalans from 1946 to 1948. Id. Researchers misled the subjects, telling them that they were being injected with vitamins or were being treated for other conditions. ¶¶ 55, 410, 411. Only some subjects were given treatment, and some of those subjects were switched to placebos. ¶ 412.

The syphilis used to inject the subjects came from four sources. Three of those sources were rabbits sent from Dr. Turner's Hopkins lab (T. cuniculi strain and Nichols strain) and rabbits sent from the PHS (Frew strain). ¶ 409. Besides being provided with the actual disease itself, Dr. Cutler received instructions and support from the researchers at Johns Hopkins,

Rockefeller, and Bristol–Myers Squibb. Bristol–Myers Squibb provided penicillin G to test as a treatment and a prophylaxis. Near the end of the Experiments, Dr. Cutler left Guatemala and was employed by Johns Hopkins, where he continued to monitor patients from the Experiments. ¶¶ 444, 446.

The Guatemala Experiments ended in the early 1950s, but none of the subjects were told that they had been infected with syphilis. ¶ 447–448. Those involved in the Experiments, kept them secret for over sixty years; no articles or studies were published about them. ¶ 449–451.

In 2010, a historian discovered information about the Guatemala Experiments. The discovery led to the creation of the United States Presidential Commission for the Study of Bioethical Issues to investigate the Guatemala Experiments and resulted in a formal apology to Guatemala in 2010 by President Obama.[19]

### C. Alien Tort Statute Claims (Count I)

The Alien Tort Statute, 28 U.S.C. § 1350 provides:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350 (2012).

■ The ATS is " 'strictly jurisdictional' . . . [and] does not directly regulate conduct or afford relief. It instead allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 133 S.Ct. 1659, 1664, 185 L.Ed.2d 671 (2013)(quoting Sosa v. Alvarez–Machain,

542 U.S. 692, 713, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)).

In the Decision Re: Second Amended Complaint, the Court held that it has jurisdiction under the ATS for a cause of action for "a violation of the norm of customary international law prohibiting medical experimentation on human subjects without their consent." [ECF No. 122] at 18 (quoting Abdullahi v. Pfizer, Inc., 562 F.3d 163, 187 (2d Cir. 2009)).

Defendants contend that the TAC fails to plead viable ATS claims because:

1. The claims are barred by the ten-year statute of limitations;

2. The TAC does not adequately state that Defendants are directly liable or liable as accessories;

3. The TAC lacks adequate facts to infer that the Plaintiffs' injuries were caused by the Guatemala Experiments; and

4. The ATS does not recognize preconception torts.

These contentions shall be addressed in turn.

#### 1. Limitations

In the Decision Re: Second Amended Complaint, this Court held that a ten-year statute of limitations period applies to Plaintiffs' ATS claims. [ECF No. 122] at 19. However, the Court did not in that decision determine when the limitations period commenced and whether the limitations period had been tolled by the alleged fraudulent concealment.

##### a. Commencement Date

■ The ATS is silent on accrual; therefore, federal common law governs the accrual of ATS claims. "Federal courts, to

19. CNN Wire Staff, US Apologizes for Infecting Guatemalans with STDs in the 1940s, CNN (Oct. 1, 2010), http://www.cnn.com/ 2010/WORLD/americas/10/01/us.guatemala.apology/.

be sure, generally apply a discovery accrual rule when a statute is silent on the issue...." Rotella v. Wood, 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured. The rule that postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured is the "discovery rule" of federal common law, which is read into statutes of limitations in federal-question cases (even when those statutes of limitations are borrowed from state law) in the absence of a contrary directive from Congress.

Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990).

In Ellul v. Congregation of Christian Brothers, 774 F.3d 791 (2d Cir. 2014), the United States Court of Appeals for the Second Circuit applied the discovery rule to an ATS claim, stating, "plaintiffs must demonstrate that they did not discover their cause of action—and could not have discovered it with due diligence—until less than ten years before bringing suit." Id. at 799 (emphasis added); see also Lampert v. Norfolk & W. Ry. Co., 966 F.2d 1442, 1992 WL 122294, at *2 (4th Cir. 1992)(unpublished table decision)("While the statute of limitations is an affirmative defense, [Plaintiff] bears the burden of establishing any exception to the rule.").

The parties dispute what information it is that a plaintiff must discover to trigger the commencement of the limitations period. The Court stated, in the Decision Re: Second Amended Complaint that the limitations period might be considered to commence on the date:

- The Plaintiff was infected either in the Guatemala Study or by a Direct Plaintiff,

- The disease manifested itself in that Plaintiff,

- The Plaintiff knew, or should have known, he/she had the disease, or

- The Plaintiff (or Estate) was on "Inquiry Notice" that there was a possible causal connection between that Plaintiff's disease and the Guatemala Study, either by virtue of the September 2011 release of the report of the United States Presidential Commission for the Study of Bioethical Issues or otherwise.

[ECF No. 122] at 21.

Defendants contend that the limitations period commenced for each individual when the Plaintiff discovered, or reasonably should have discovered, the "injury," i.e., had signs or symptoms of syphilis. Plaintiffs contend that the ten-year period did not begin to run until a Plaintiff discovered the injury and its probable cause. Plaintiffs allege that they did not know the probable cause of their injuries until after there was public disclosure of the Guatemala Experiments, after the release of the Commission's Report in 2011, and they were identified, contacted, and tested. ¶ 483.

In United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the plaintiff began experiencing ear pain at a Veteran's Administration hospital and was told that the pain may have been caused by a drug he was given there. Id. at 114, 100 S.Ct. 352. The plaintiff initiated a medical malpractice suit under the Federal Tort Claims Act, 28 U.S.C. § 1346, after the normal limitations period would have run. Id. at 115, 100 S.Ct. 352. The Kubrick

Court held that the suit was untimely because, even though the plaintiff may not have known his injury was caused by negligent administering of a drug, he did know that he was injured, that the injury came from the drug, and who had given him that drug. The Court reasoned:

We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.

Id. at 122 (emphasis added); see also Hughes v. United States, 263 F.3d 272, 276 (3d Cir. 2001); Drazan v. United States, 762 F.2d 56, 58–59 (7th Cir. 1985)(holding that knowledge of the actual cause of injury is necessary for a medical malpractice claim to accrue).

In Heinrich v. Sweet, 44 F.Supp.2d 408 (D. Mass. 1999), family members of deceased cancer patients sued a hospital and the United States Government for conducting non-therapeutic radiation experiments on the patients during brain surgery without the patients' consent or knowledge. The plaintiffs filed suit more than thirty years after the experiments took place. The Heinrich court, in addressing the limitations issue, stated "the precise issue for resolution is when each of the plaintiffs knew, or with reasonable diligence should have known, that the Com-

mission's experiment facilitated death or otherwise caused tortious injury." Id. at 416 (emphasis added). The court clearly considered knowledge of an injury's cause to be a "critical fact." Id. at 418.

This rationale has been used in ATS cases. In Ellul, the plaintiffs brought a human trafficking claim under the ATS. The Court found that the claim was untimely because "[b]y the time plaintiffs reached the age of majority, each of them knew that he or she had been abducted from his or her family, imprisoned, abused, forced to work for no pay, and not provided any education," and that the "defendants effected [the plaintiffs'] transfer to Australia through some sort of deception or abusive tactic." Ellul, 774 F.3d at 799–800. Although the Ellul court said that it was "dubious" that the discovery rule required plaintiffs to know a defendant is liable under a certain cause of action, it stated that "the diligence-discovery rule delays the date of accrual where the plaintiff 'is blamelessly ignorant of the existence or cause of his injury.'" Id. at 801 (emphasis added)(quoting Barrett v. United States, 689 F.2d 324, 327 (2d Cir. 1982)).

■ The Court holds that an ATS claim does not accrue and the limitations period does not commence when a plaintiff, through no fault of his or her own, is unaware of an injury's existence or factual cause.

■ In the instant case, the TAC alleges that Plaintiffs knew only part of the critical facts surrounding their injuries. They knew that they were experiencing certain physical symptoms, but they did not know who had inflicted the injury, or even if the undiagnosed injury had been caused by another person, rather than a naturally-occurring illness. While Plaintiffs may have believed they received some form of vitamin or medical treatment, see,

e.g., ¶¶ 55, 61, they did not know the critical fact that they had been injected with strains of syphilis.

 The relevant inquiry is whether a person in a plaintiff's shoes would have been able to discover the critical facts. The TAC adequately alleges a plausible contention that Plaintiffs could not have discovered the cause of their injuries if they had exercised due diligence.

The experimenters allegedly targeted the subjects of the Guatemala Experiments because of their inability to understand, discover, and control what was happening to them. Many of the subjects were young schoolchildren, patients in an asylum, or prisoners without access to proper medical care, education, or resources. These types of persons would have been unlikely to discover his or her exact injury and its cause. Of course, Defendants are free to assert in light of evidence to be obtained, that any particular Plaintiff was on such notice as to commence the limitations period more than ten years prior to the filing of the lawsuit. However, there is no allegation in the TAC that any Plaintiff possessed any information that would have triggered a duty to investigate further. See Thompson v. United States, 642 F.Supp. 762, 768 (N.D. Ill. 1986)("[W]here the plausible explanation is one of purely natural causes (such as lupus), there is initially no reasonable basis for supposing the doctors did not provide adequate and proper medical care. It is not the purpose of the discovery rule to encourage or reward simple paranoia."). Even when a Plaintiff consulted a doctor about his/her condition, it is possible that he/she would not obtain information leading them to trace their infections back to the Guatemala Experiments.[20]

As to Plaintiffs who are Spouses of the Direct Plaintiffs, even if they would have known that their syphilis was contracted from a Direct Plaintiff, they would not know the critical fact of the cause of their spouses' syphilis—the Experiments.

Thus, Defendants are not entitled to dismiss all ATS claims since Plaintiffs have alleged facts establishing a plausible claim that the limitations period did not commence until they discovered the cause of their injuries—the infection of syphilis by the researchers. The Representative Plaintiffs allege that they did not discover this fact until 2013 at the earliest. E.g., ¶¶ 56, 64, 70, 76, 83, 89, 94.

If, as alleged in the TAC, Plaintiffs can be held aware of the source of the pertinent syphilis in 2010 when the Guatemala Experiments were revealed, the instant suit, filed in 2015, is timely under the ten-year limitations period.

#### b. Equitable Tolling

 Even if the limitations period commenced running more than ten years prior to the commencement of the law suit, Plaintiffs might be entitled to the equitable tolling that is "grafted on to federal statutes of limitations." Cada, 920 F.2d at 451.

> [Equitable tolling] permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.... the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant.

20. For example, one of the Category 4 or "Grandchildren" Plaintiffs, Ronald Roberto Benavente Galvez, Plaintiff # 70, was mis-diagnosed as a child with juvenile rheumatic arthritis, when really his deformities were caused by congenital syphilis. ¶ 127.

Id. "Additionally, in order to apply equitable tolling, courts usually require some affirmative misconduct, such as deliberate concealment." Cabello v. Fernandez–Larios, 402 F.3d 1148, 1155 (11th Cir. 2005)(quoting Arce v. Garcia, 400 F.3d 1340, 1349 (11th Cir. 2005)).

> "Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Equitable tolling is "applicable only in rare and exceptional circumstances," where it is necessary "as a matter of fairness."

Ellul, 774 F.3d at 801 (citations omitted).

There are certainly serious issues presented regarding the applicability of equitable tolling in the instant case. For example, whether the Defendants can be held responsible for the concealment on which the equitable tolling is based. However, because the Court has determined that the ATS limitations period did not commence until 2010 at the earliest for the Plaintiffs, Defendants' equitable tolling contentions are moot and need not be addressed.

### 2. Corporate Liability

■ The allegedly tortious actions on which Plaintiffs' claims are based were committed by certain individuals, such as Dr. Cutler, who can be referred to as the "primary perpetrators." Plaintiffs seek to have the Court hold the Defendant entities liable for the torts committed by these primary perpetrators. Therefore, the Court must determine whether the TAC has alleged facts adequate to allow a plausible inference that

- the Defendant entities can be held vicariously liable for the acts taken by the primary perpetrators, or

- the Defendant entities (or their agents within the scope of their agency) aided and abetted or conspired with the primary perpetrators in committing the tortious acts.[21]

To decide the issue of Defendants' liability, the Court must address two sub-issues: (1) the correct standard for corporate liability under the ATS, and (2) whether the TAC adequately alleges that the individuals involved in the Experiments were acting within their scope of employment or were otherwise agents of the entity Defendants at the time.

---

**21.** As stated in its last Decision, the Court will follow the majority consensus that corporations can be liable under the ATS. See, e.g., Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1022 (9th Cir. 2014); Doe VIII v. Exxon Mobil Corp., 654 F.3d 11, 57 (D.C. Cir. 2011), vacated on other grounds, 527 Fed.Appx. 7 (D.C. Cir. 2013); Flomo v. Firestone Nat. Rubber Co., 643 F.3d 1013, 1021 (7th Cir. 2011); Romero v. Drummond Co., 552 F.3d 1303, 1315 (11th Cir. 2008); Al–Quraishi v. Nakhla, 728 F.Supp.2d 702, 753–54 (D. Md. 2010), rev'd sub nom. on other grounds Al– Quraishi v. L–3 Servs., Inc., 657 F.3d 201 (4th Cir. 2011); Al Shimari v. CACI Premier Tech., Inc., No. 108CV827LMBJFA, 263 F.Supp.3d 595, 599 n.4, 2017 WL 2805496, at *3 n.4 (E.D. Va. June 28, 2017). The Court and the parties recognize that the United States Supreme Court granted certiorari to address whether the ATS categorically forecloses corporate liability, Jesner v. Arab Bank, PLC, — U.S. —, 137 S.Ct. 1432, 197 L.Ed. 2d 646 (2017), but the parties do not wish to stay the instant case. If necessary, the Court will readdress this issue after the Supreme Court reaches a decision.

### a. The Standard for Corporate ATS Liability

As the Court recognized in its Decision re: Second Amended Complaint, "there is an issue whether the extent of corporate liability under the ATS is essentially equivalent to respondeat superior, applying only to corporate action at the entity's decision-making level, or is subject to some different test." [ECF No. 122] at 30. Defendants assert that a test similar to the Monell[22] standard used in § 1983 cases should be the standard for ATS corporate liability, whereas Plaintiffs contend that a "respondeat superior plus knowledge" standard is the appropriate test.

The issue presented is neither resolved by binding authority nor addressed by a consensus of judicial decisions.[23]

■■■ The initial question is whether, for an ATS law of nations claim, international or domestic law governs the topic of corporate liability.[24] The Court finds the Ninth Circuit's analysis of this point persuasive:

> Although international law controls the threshold question of whether an international legal norm provides the basis for an ATS claim against a corporation, there remain several issues about corporate liability which must be governed by domestic law. This division of labor is dictated by international legal principles, because international law defines norms and determines their scope, but delegates to domestic law the task of determining the civil consequences of any given violation of these norms. Thus, when questions endemic to tort litigation or civil liability arise in ATS litigation—such as damages computation, joint and several liability, and proximate causation—these issues must be governed by domestic law. Many questions that surround corporate liability fall into this category, including, most importantly, the issue of when the actions of an individual can be attributed to a corporation for purposes of tort liability. Determining when a corporation can be held liable therefore requires a court to apply customary international law to determine the nature and scope of the norm underlying the plaintiffs' claim, and domestic tort law to determine whether recovery from the corporation is permissible.

Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1022 (9th Cir. 2014) (citations omitted);

---

**22.** Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**23.** See, e.g., Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 525 n.5 (4th Cir. 2014)(confirming that the issue of corporate vicarious liability was not before the court); Nestle USA, Inc., 766 F.3d at 1023 (leaving issue for district court to address); Flomo, 643 F.3d at 1020–21 (7th Cir. 2011)(declining to decide how far corporate liability extends); Mamani v. Berzain, 21 F.Supp.3d 1353, 1376 n.22 (S.D. Fla. 2014)(finding it unnecessary to decide whether high-ranking government officials were liable for acts of police and soldiers under agency principles because plaintiffs adequately pleaded "commander liability theory"), aff'd in part, appeal denied in part, 825 F.3d 1304 (11th Cir. 2016).

**24.** Compare Doe v. Exxon Mobil Corp., 654 F.3d at 51 ("[T]he technical accoutrements to the ATS cause of action, such as corporate liability and agency law, are to be drawn from federal common law."), with In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., 792 F.Supp.2d 1301, 1352 (S.D. Fla. 2011)(rejecting agency theory for vicarious liability because no authority recognizes it under international law), on reconsideration in part sub nom. In re: Chiquita Brands Int'l, Inc., No. 07-60821-CIV-MARRA, 2012 WL 12539695 (S.D. Fla. Mar. 27, 2012), and rev'd sub nom. Cardona v. Chiquita Brands Int'l, Inc., 760 F.3d 1185 (11th Cir. 2014).

see also Flomo v. Firestone Nat. Rubber Co., LLC, 643 F.3d 1013, 1020 (7th Cir. 2011)("International law imposes substantive obligations and the individual nations decide how to enforce them."). Thus, the Court will look to federal common law and domestic tort law for guidance.

"[E]ven within our federal system, there are a variety of approaches to determining how the courts are to impute to a corporation the conduct and intent of its employees or agents." Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 147 n.51 (2d Cir. 2010), aff'd 569 U.S. 108, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013). According to Defendants, the doctrine of respondeat superior does not apply to ATS cases. Defendants' recommended standard mirrors that of Monell; Defendants contend that Plaintiffs must allege that their rights were violated pursuant to a policy or practice of the Defendant entities.

Defendants' argument stems from a reference to Monell in a single sentence of Judge Posner's opinion in Flomo:

> [T]he plaintiffs concede that corporate liability for such violations is limited to cases in which the violations are directed, encouraged, or condoned at the corporate defendant's decisionmaking level. That is analogous to the liability of municipalities under the Monell doctrine, where as we noted recently "a person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government—by the city council, for example, rather than by the police officer who made an illegal arrest." Vodak v. City of Chicago, 639 F.3d 738, 747. (7th Cir. 2011). We needn't decide how far corporate vicarious liability for violations of customary international law extends; it's enough that we see no objection to corporate civil liability as circumscribed as the plaintiffs concede.

Flomo, 643 F.3d at 1020–21 (emphasis added). Clearly, Flomo did not hold that a Monell standard of corporate liability applied to ATS cases. Judge Posner simply pointed out the similarity between the standard conceded to by the Flomo plaintiffs and that recognized in Monell.

Plaintiffs maintain that the TAC allegations would meet a Monell-type liability standard. Plaintiffs contend, however that the Court should apply respondeat superior, or a "respondeat superior plus knowledge" standard to hold Defendants liable. Specifically, Plaintiffs contend that a corporation should be liable for acts taken by its employees in the scope of their employment, as long as mid-level management (or higher) has knowledge of those acts. This is not greatly different from the Flomo decision's "directed, encouraged, or condoned at the corporate defendant's decisionmaking level" standard.

It is not inappropriate for federal courts to fill in the gaps of the ATS by analogy to other areas of federal common law. See, e.g., Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995)(borrowing from § 1983 precedent to determine whether the acts of a private person or corporation constituted state action for ATS purposes). Additionally, the Fourth Circuit[25] has held that the Monell standard, and not respondeat superior, applies to private corporations sued under 28 U.S.C. § 1983. See Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982).

---

**25.** "All other circuits that have addressed the issue have reached the same conclusion, extending the Monell standard to private corporations." Shields v. Illinois Dep't of Corr., 746 F.3d 782, 790 (7th Cir. 2014)(collecting cases)(footnote omitted).

■ However, the Powell holding, like Monell, was based upon the specific text of § 1983, which imposes liability on a person who subjects or "causes to be subjected" a person "to the deprivation of any rights." 42 U.S.C. § 1983 (2012). "For a third party to be liable the [§ 1983] statute demands of the plaintiff proof that the former 'caused' the deprivation of his Federal rights." Powell, 678 F.2d at 506 (footnote omitted). The Powell court also noted that the "[Monell] Court observed that the policy considerations underpinning the doctrine of respondeat superior insufficient to warrant integration of that doctrine into the statute." Id.

The Fourth Circuit's reasons for rejecting respondeat superior in § 1983 suits against private corporations are not applicable to suits pursuant to the ATS. The text of the ATS, 28 U.S.C. § 1350, contains no language regarding causation or who is subject to suit. Additionally, the Monell Court focused on the legislative history of the Sherman Amendment, which did not pass because Congress feared that it would be unconstitutional to impose liability on municipalities if they failed to prevent mobs in their towns from causing harm. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 679–80, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Applying respondeat superior to private entities raises no such constitutional or federalism concerns.

Additionally, the application of Monell to private corporations, even in § 1983 suits, has been called into doubt.[26] In Shields v. Illinois Dep't of Corr., 746 F.3d 782 (7th Cir. 2014), the United States Court of Appeals for the Seventh Circuit pointed out the practical difficulties of applying Monell to private entities, asking, "How does a court identify the relevant 'final policymaker' in a corporation? Is it the CEO, the board of directors, the shareholders?" Shields, 746 F.3d at 795 n.4. The Monell standard is cumbersome when applied to private entities. The Shields court's rationale lends support to the notion that the Monell standard was not intended to, nor is it well-equipped to, apply to private corporations.[27]

When faced with ATS claims against corporate defendants, federal courts have considered general agency principles, elements of control, and knowledge by a corporation's executives or managers.[28] See

**26.** "The rejection of respondeat superior liability for municipalities in Monell has been the subject of extensive analysis and criticism." Shields, 746 F.3d at 791 (citing cases and articles); see also Adickes v. S. H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)(contemplating that respondeat superior would apply to hold the defendant entity liable for a constitutional violation under § 1983 for its employee's conspiracy with a policeman to deny service to a customer based on race).

**27.** See also Hutchison v. Brookshire Bros., 284 F.Supp.2d 459, 473 (E.D. Tex. 2003)(holding Monell does not shield private entities from vicarious liability in § 1983 context); Barbara Kritchevsky, Civil Rights Liability of Private Entities, 26 Cardozo L. Rev. 35, 70–75 (2004)(suggesting courts should re- consider application of Monell to private corporations).

**28.** Defendants refer to the following statement in Mamani v. Berzain, 654 F.3d 1148 (11th Cir. 2011), as evidence that courts do not recognize respondeat superior in ATS cases:

We do not accept that, even if some soldiers or policemen committed wrongful acts, present international law embraces strict liability akin to respondeat superior for national leaders at the top of the long chain of command in a case like this one.

Id. at 1154. Not only was this statement dicta, but the basis of the claim in that case was very different—the Mamani defendants were high-ranking officials in the foreign government, not corporations; thus, applying respondeat superior in that context raises a host

Doe v. Exxon Mobil Corp., 654 F.3d at 47–48 ("[A]gency law determines whether a principal will pay damages for the battery committed by the principal's agent. Here the court may assume that individuals acting as agents of a corporation violated substantive international law norms."); Sarei v. Rio Tinto, PLC, 487 F.3d 1193, 1202–03 (9th Cir. 2007), ("Courts applying the [Alien Tort Statute] draw on federal common law, and there are well-settled theories of vicarious liability under federal common law."), on reh'g en banc, 550 F.3d 822 (9th Cir. 2008); Bowoto v. Chevron Texaco Corp., 312 F.Supp.2d 1229, 1241–46 (N.D. Cal. 2004)(applying agency principles to consider whether parent corporation was liable for acts of its subsidiary in an ATS case).

In Doe v. Exxon Mobil Corp., the United States District Court for the District of Columbia concluded that the plaintiffs sufficiently stated a claim of aiding and abetting a violation of the law of nations under the ATS when plaintiffs alleged that

- the Indonesian military unit providing security for [Defendant] Exxon's facilities "used Exxon facilities, supplies, and vehicles to commit various human rights abuses";

- Exxon executives received reports that "Exxon security personnel were committing human rights violations on Exxon property, using Exxon equipment";

- Exxon executives "caused the provision of supplies and vehicles to Exxon security personnel"; and

- Exxon executives "planned and approved the deployments of security personnel."

Doe v. Exxon Mobil Corp., No. CV 01-1357(RCL), 2015 WL 5042118, at *13–*15 (D.D.C. July 6, 2015). Additionally, the Doe court stated that "[a]lthough it is a matter of considerable disagreement among the parties, plaintiffs allege, and the Court accepts as true for purposes of this motion, that Exxon exercised substantial control over the activities of these soldiers, including approving and planning specific operations and deployment locations." Id. at *1. The alleged knowledge and involvement of executives were enough to state a claim.[29]

Other factors weigh in favor of applying respondeat superior or a "respondeat superior plus" standard. For example, respondeat superior was a feature of the common law at the time the ATS was written.[30] Additionally, the remedial in-

of considerations that would not be relevant with private corporations. Thus, the Court does not see Mamani as evidence that respondeat superior can never apply in ATS cases.

29. "In general the Board of Directors, Managing Director and other superior officers of a company will be considered to speak and act as the company and therefore their state of mind will be considered by a Court seeking evidence of the company's state of mind. The law also recognises that at times these officers may delegate their functions to other company employees—in which case their state of mind may provide evidence of company state of mind." International Commission of Jurists, 3 Corporate Complicity & Legal Accountability 15 (2008).

30. See, e.g., Doe v. Exxon Mobil Corp., 654 F.3d at 57 ("The law of the United States has been uniform since its founding that corporations can be held liable for the torts committed by their agents."); Gray v. President, etc., of Portland Bank, 3 Mass. 364, 385 (1807)(noting that the principle that masters are responsible for the misconduct of their agents "has been so frequently recognized in courts of justice, that a reference to authorities is deemed superfluous" and that "[i]n no case is this principle of so much importance as in the relation of corporations to their servants"); 1 William Blackstone, Commentaries, *429–*430 ("As for those things which a servant may do on behalf of his master, they seem all to proceed upon this principle, that the master is answerable for the act of his

tent[31] behind the ATS weighs in favor of applying some formulation of respondeat superior. As stated in Shields, "[w]e should not insulate employers from respondeat superior liability ... without powerful reasons to do so" because "[i]nsulating private corporations from respondeat superior liability significantly reduces their incentives to control their employees' tortious behavior and to ensure respect for [other's] rights." Shields, 746 F.3d at 792, 794. Last, applying respondeat superior could better fulfill federal common law objectives of uniformity. Cf. Barbara Kritchevsky, Civil Rights Liability of Private Entities, 26 Cardozo L. Rev. 35, 70–71 (2004)(noting inconsistency and incoherency in § 1983 cases involving private entities due to application of the Monell standard).

■ The Court finds it unnecessary herein to resolve the legal issue regarding the Monell standard because the TAC contains factual allegations adequate to present a plausible claim that would satisfy a Flomo/Monell-type standard requiring a custom, policy, or practice of rights violations. Monell liability can be based upon:

(1) Formally approved policies;

(2) Decisions of a final decisionmaker; or

(3) A custom that is so persistent, widespread, permanent and well settled as to constitute a custom or usage with the force of the law.

See Monell, 436 U.S. at 690–92, 98 S.Ct. 2018; Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ The TAC alleges that the acts of the primary perpetrators were known, directed, and encouraged by high-ranking individuals with decisionmaking authority within each entity Defendant. The TAC also alleges that the Guatemala Experiments were the continuation of a pattern of human experimentation, beginning with the Tuskegee Study, conducted in part by individuals at Hopkins and Rockefeller.

At Hopkins, Dr. Moore and Dr. Eagle were directors of departments, Dr. Turner was the Chair of the Department of Bacteriology and then Dean of the School of Medicine, Dr. Weed was Dean and Director of the Hopkins School of Medicine, and Dr. Reed was Dean of the School of Public Health, Vice President of Johns Hopkins, and then President of Johns Hopkins University in 1950. The TAC states that these men were delegated decisionmaking authority and were not under the control of an Institutional Review Board. ¶ 159. For example, Dr. Turner frequently entered contracts committing Hopkins doctors and researchers to work on projects with governmental entities. ¶ 186.

Likewise, Drs. Wintersteiner, Rake, Richardson, and Kitchen, who are alleged to have known about and contributed to the Guatemala Experiments, were Directors of various divisions at Bristol Laboratories and the Squibb Institute during the time of the Guatemala Studies, and similarly are alleged to have had decisionmaking authority at their various entities.

Last, as to Rockefeller, the TAC alleges knowledge and involvement on behalf of

---

servant, if done by his command, either expressly given, or implied: nam qui facit per alium, facit per se."); W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 69 (5th ed. 1984) ("The idea of vicarious liability was common enough in primitive law").

**31.** See Kiobel, 133 S.Ct. at 1672 (Breyer, J., concurring) ("The statute's purpose was to address 'violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs.' ")(quoting Sosa, 542 U.S. at 715, 124 S.Ct. 2739).

Dr. Parran, who was a Chairman of Rockefeller's Board of Directors and a Scientific Director of Rockefeller's International Health Division, and Dr. Strode, who was also a Director of Rockefeller's International Health Division. Allegedly, these individuals were some of the "key men" given independent policymaking authority within Rockefeller. ¶¶ 213–214.

The facts alleged make plausible an inference that these individuals acted as decisionmakers within each of their respective entities. Ultimately, determining the actual authority of each of these individuals will involve questions of fact that need to be resolved at a later stage of the case.[32] However, at the instant stage, with the "facts" viewed in a light most favorable to Plaintiffs, the TAC adequately alleges a plausible contention that the Defendants' named doctors/officers were decisionmakers who engaged in a multi-year practice of wrongdoing. Therefore, actions taken by or directed by these individuals, if acting as servants/agents for the Defendants, could plausibly form the basis for corporate liability.[33]

### b. Agency and Scope of Employment

The Court must determine whether the TAC has adequately alleged facts presenting a plausible claim that, at the critical times, the Doctors,[34] or the primary perpetrators, were acting as agents or servants of Hopkins, Rockefeller, or Bristol–Meyers Squibb, rather than agents of the Government.

Agency arises when a principal manifests assent that an agent "shall act on his behalf and subject to his control, and consent by the [agent] so to act." Restatement (First) of Agency § 1 (1933).[35] "A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." Id. § 2. A person may simultaneously be the servant of two masters "at one time as to one act, provided that the service to one does not involve abandonment of the service to the other." Id. § 226. A master may also lend a servant to another such that the servant may become the agent of another as to some acts. Id. § 227.

"To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." Id. § 229. A court should consider the following matters of fact to determine whether an act is within the scope of employment:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

---

**32.** A final determination as to the actual decisionmaking authority or power of a particular officer or doctor is a factual one that is better taken after discovery. Cf. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 543, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)(considering employer liability in Title VII case and noting that "determining whether an employee meets this description [of managerial capacity] requires a fact-intensive inquiry").

**33.** Of course, Plaintiffs will eventually have to do more than merely allege that these individuals were decisionmakers with institutional authority who participated in the alleged torts—they must prove it. Cf. Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 404 (4th Cir. 2014).

**34.** Particularly Dr. Parran (U.S. Surgeon General), Dr. Soper (PASB Director), and the Hopkins doctors in the Syphilis Study Section.

**35.** References herein are to the Restatement (First) of Agency because this was the version in effect at the time of the Experiments.

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

Id.

■ Therefore, an employee may be acting within the scope of employment even if the employee engages in acts "specifically forbidden" by the employer and uses "forbidden means of accomplishing results." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 543, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); see also Restatement (First) of Agency § 230.

### i. Hopkins Doctors

Defendants do not dispute Plaintiffs allegations that Drs. Moore, Eagle, Turner, Weed, and Reed were employed by Hopkins at the time of the Experiments. However, Defendants argue that in regard to the Experiments these Doctors were acting as agents of the United States Government.

■ Taking only the facts as alleged in the TAC with all inferences in favor of Plaintiffs, Plaintiffs present a plausible claim that the Hopkins doctors were acting within the scope of their employment with Hopkins. According to the TAC allegations, they were performing medical research of the type they were employed by Hopkins to do, were motivated, at least in part by a purpose to serve Hopkins as an institution, their involvement occurred at least in part on Hopkins' premises, and aiding nonconsensual human experimentation could not be unexpected by Hopkins because Hopkins decisionmakers knew and planned the Experiments and Hopkins doctors had in the past participated in ethically unsound human experiments (Tuskegee and Terre Haute).

As Comment (b) to § 227 of the Restatement (First) of Agency (Servant Lent to Another Master) notes:

In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

Comment b to Restatement (First) of Agency § 227.

Nothing in the TAC destroys this inference. Plaintiffs allege that the Doctors did not become federal employees as a result of serving on the Syphilis Study Section, and Hopkins continued to pay all of their costs, expenses, and benefits. ¶ 312. Allegedly, Hopkins retained control over the Doctors and could give or withhold permission to attend Syphilis Study Section meetings. Id. The Government did not control the Study Section, which was an "autonomous body" with "full authority" to review applications and authorize projects. ¶¶ 317, 361. Hopkins doctors were encouraged and expected to serve on Government panels because involvement in these types of public studies benefited Hopkins as an institu-

tion by lending prestige in the medical field, especially the field of STD research, and by placing Hopkins in a position to receive research grants. ¶¶ 276, 313, 314, 315. Tenure at Hopkins was linked to participation in the panels. ¶ 313. Plaintiffs assert that Hopkins, through Dr. Moore, packed the Syphilis Study Section with doctors from Hopkins so that Hopkins could control STD studies and funding.[36] ¶ 311.

The TAC also alleges that the plan for the Guatemala Experiments was devised apart from the Study Section and was presented by the control group to the Study Section for funding purposes. Additionally, Drs. Moore, Reed, Turner, and Eagle used Hopkins staff, supplies, and resources to aid the Experiments and train the PHS doctors to carry out the Experiments. ¶ 300. For example, Dr. Reed, who became Johns Hopkins President in 1950, used his Department of Biostatistics staff and departmental resources to collect and analyze data and provide logistical support for the Experiments. ¶ 182. He did this to advance Hopkins' position in the medical field. ¶ 183.

Therefore, the Court concludes, based on the TAC, that Plaintiffs have successfully alleged that Drs. Moore, Reed, Turner, and Eagle were acting as servants of Hopkins during the Guatemala Experiments.

### ii. Rockefeller Directors

■ Plaintiffs contend that Rockefeller is responsible for the actions of Drs. Parran, Strode, and Soper. The TAC alleges, as background, that Rockefeller selected research partners and projects to further

its mission to promote national and international public health research, used contacts to get Government support, and then directed and controlled the research itself. ¶¶ 210–211. "The Rockefeller Foundation's philosophy has always been that it is a partner, not a patron, and it works through governments, not for them." ¶ 212 (footnote omitted). Specifically, the TAC alleges that Rockefeller established an outpost in Guatemala, and sent employees to staff it.

Plaintiffs contend that Dr. Parran was a co-agent of the Government, as Surgeon General, and Rockefeller, as a trustee, Board Chairman, and Director of the International Health Division. The TAC alleges that he worked for the PHS and Rockefeller "simultaneously" and acted for the benefit of both organizations because he saw their missions as "coextensive" and research into venereal diseases benefited both. ¶ 226. He used his staff from both PHS and Rockefeller to provide logistical support. ¶ 229. In 1949, Dr. Parran resigned as Surgeon General, but continued his involvement with the Experiments and with Rockefeller. ¶ 443. Although Plaintiffs do not allege that Rockefeller had the right to, or did, control Parran's actions, there is a plausible claim that Dr. Parran was acting for the benefit of Rockefeller and that his positions within the entity lead to a reasonable inference of agency. Therefore, the TAC plausibly claims that Dr. Parran was acting as an agent of Rockefeller in regard to the Experiments.

Dr. Strode was a Rockefeller employee[37] and a Director of Rockefeller's International Health Division. ¶ 242. The TAC

---

36. "Dr. John Stokes, a researcher who was a member of the Syphilis Study Section noted in February of 1947 that '[a]ll the primary allocations of penicillin and fields of work were made by th[e] Subcommittee [on Venereal Disease] and that means virtually made

by J. Earle Moore.'" ¶ 309 (alterations in original).

37. Unlike Dr. Parran, Dr. Strode is not alleged to have served in any Government capacity, so there is no dual-servant issue.

alleges that he helped plan and oversee the Experiments "to further the policies and interests of the Rockefeller Foundation." ¶ 247. Dr. Strode received reports from Dr. Soper on what was happening in Guatemala, and he informed Rockefeller's Executive Committee. ¶ 239. Therefore, the TAC adequately supports a reasonable inference that Dr. Strode acted within the scope of his employment as an agent of Rockefeller.

Plaintiffs have alleged adequate facts to support a plausible claim that Dr. Soper was a servant of Rockefeller whose actions were taken in the scope of his employment, even though he was a director of the PASB during the Guatemala Study. The TAC alleges:

- "In January 1947, The Rockefeller Foundation assigned Dr. Soper to the Pan American Sanitary Board (PASB) where he was immediately designated as the 'Responsible Investigator' for the Guatemala Experiments." ¶ 395.

- Rockefeller "had institutional control over the PASB and periodically used it to implement its policies." ¶ 396.

- "Throughout the Guatemala Experiments, Dr. Soper remained an employee and Associate Director of The Rockefeller Foundation. It paid his entire salary, expenses, and costs. It paid his health insurance. . . . He retained free access to Rockefeller Foundation offices. . . ." ¶ 400.

- "[Dr. Soper] continued to report directly to the Director of Rockefeller's International Health Division, Dr. George Strode, both in person and through written reports and updates. He wrote reports to The Rockefeller Foundation's Executive Committee detailing the work performed. He wrote multiple letters and reports to Dr. Parran. He re-

ceived agendas and comments from meetings of The Rockefeller Board of Scientific Directors, even though non-board members had never received them before. He leaked details of PASB policies to Dr. Strode before they became public so the Foundation could adapt its policies. And, he worked behind the scenes with Rockefeller to coordinate their policies with the PASB's policies." ¶ 400.

- "Dr. Soper later wrote that his move was not of 'abandonment of The Rockefeller Foundation but rather of fulfilling its program.' " ¶ 397.

- "Chester Barnard, President of The Rockefeller Foundation, correctly wrote that Dr. Soper's move to the PASB 'was designed to cover most of the purposes which the [Rockefeller's International Health Division] pursued in Latin America.' " ¶ 238 (alteration in original).

These factual allegations are adequate to present a plausible claim that Dr. Soper was acting as a servant of the Rockefeller Foundation within the scope of his employment even while serving as "Responsible Investigator" and PASB director. He was acting to fulfill Rockefeller's mission and goals, and was under the direction of, and reporting to, the Rockefeller Board of Directors.

### iii. Bristol–Meyers Squibb Doctors

 The TAC alleges that Bristol–Meyers Squibb, through Drs. Wintersteiner, Rake, Richardson, and Kitchen, provided the penicillin G that was used in the Experiments and additional support and direction to the researchers on the ground. E.g., ¶ 458. It is plausibly claimed that these officers were acting within the scope of their employment because they were acting to improve Bristol–Meyers Squibb's

predecessors' product and further the employers' business interests.

### c. Direct Violation Through Primary Perpetrators

Plaintiffs allege that Defendants are liable as primary perpetrators—not just as aiders and abettors or conspirators. That is, Plaintiffs contend that Defendants controlled and directed Dr. Cutler (a PHS employee), Dr. Soper, Dr. Funes (a Guatemalan doctor with a PHS fellowship), and the U.S. Government researchers on the ground, and are thus vicariously liable for the actions of the primary perpetrators.

To show that the primary perpetrators were the Defendants' agents, Plaintiffs rely on the following allegations:

- Defendants "purposefully selected the team of researchers that would implement the Experiments on the ground." ¶ 495.

- Defendants and their servants or agents "direct[ed] and overs[aw] the implementation of the Experiments, including frequent communications with each other, Dr. Soper, Dr. Cutler, and the researchers on the ground." ¶ 492.

- "Drs. Moore, Turner, Reed, and Eagle committed Johns Hopkins ... with full knowledge of and control over how the Experiments would be conducted." ¶ 386.

- "Dr. Parran, Dr. Moore, Dr. Wintersteiner, and their colleagues selected Dr. Cutler...." ¶ 391.

- Dr. Cutler "[f]ollow[ed] the directions given to him by Dr. Moore and others in the control group...." ¶ 319.

- "Dr. Moore, like he had done in both of the prior studies, continued to monitor, supervise, support, aide, encourage, participate in, direct and control the Guatemala Experiments throughout. He regularly corresponded with Dr. Cutler, actively directing the work of the researchers in Guatemala...." ¶ 416.

- "Dr. Turner instructed Dr. Cutler to conduct experiments" with T. cuniculi. ¶ 418.

- Various allegations that certain individual doctors "oversaw" what was happening on the ground in Guatemala. See, e.g., ¶¶ 497, 513, 519, 543.

 These allegations are either conclusory or do not present a plausible claim that any Defendant established an agency relationship with Dr. Cutler and the other researchers or had the right to control their actions. Simply stating that various doctors employed by Defendants "oversaw," "controlled," or "directed" Dr. Cutler and his team, without more, is not adequate to present a plausible claim that Defendants were their principals and are vicariously liable for their actions. The TAC has no factual allegations that the Defendants paid those researchers, had an employment relationship, or the right to hire or fire them.

However, as discussed above, the TAC does adequately state that Dr. Soper did act within the scope of his employment at Rockefeller. According to the TAC, Dr. Soper's diary confirms that "for brief periods of time, [he] engaged in the experiments with Dr. Cutler and the researchers on the ground in Guatemala." ¶ 426. Therefore, the Plaintiffs have adequately presented a plausible claim that Rockefeller, via its employee Dr. Soper, who was acting under the direction of Rockefeller executives, can be liable as a perpetrator of crimes against humanity.

#### d. Accessory Liability

Plaintiffs do not adequately allege that Hopkins or Bristol directly committed nonconsensual human experimentation. However, Plaintiffs allege that all Defendants were co-conspirators with, and aided and abetted, the perpetrators of these crimes against humanity committed against the victims of the Guatemala Experiments.

##### i. Aiding and Abetting

■ The United States Court of Appeals for the Fourth Circuit has held that to be liable as an aider and abettor under the ATS, "a defendant must provide substantial assistance with the purpose of facilitating the alleged violation." Aziz v. Alcolac, Inc., 658 F.3d 388, 401 (4th Cir. 2011).[38] Therefore the TAC must allege nonconclusory facts establishing both the actus reus (substantial assistance)[39] in carrying out the Guatemala Study, and the mens rea (purpose) for nonconsensual experimentation.

In general, federal courts have been reluctant to find that the requisite mens rea exists when a corporate defendant merely does business with a company or government involved in human rights violations, even when, in the course of normal business, the defendant provides products that are used by third parties to harm others. See, e.g., Aziz, 658 F.3d at 401; Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 262–63 (2d Cir. 2009). Similarly, "[c]ourts have concluded, for ex-

ample, that merely providing financing as part of an ordinary commercial transaction does not satisfy the actus reus requirement. There must be some sort of direct relationship between the underlying violation and the assistance rendered." Doe v. Exxon Mobil Corp., No. CV 01-1357(RCL), 2015 WL 5042118, at *9 (D.D.C. July 6, 2015)(citations omitted).

However, in Doe I v. Nestle USA, Inc., 766 F.3d 1013 (9th Cir. 2014), the United States Court of Appeals for the Ninth Circuit examined how Nestle allegedly benefited from getting products from cocoa farms that used child slave labor, and concluded that the plaintiff's allegations met the "purpose" standard for aiding and abetting liability.

According to the allegations here, the defendants have not merely profited by doing business with known human rights violators. Instead, they have allegedly sought to accomplish their own goals by supporting violations of international law. In Talisman, by contrast, the defendant did not in any way benefit from the underlying human rights atrocities carried out by the Sudanese military, and in fact, those atrocities ran contrary to the defendant's goals in the area, and even forced the defendant to abandon its operations. Talisman, 582 F.3d at 262. Similarly, in Aziz, the plaintiffs alleged that the defendants sold chemicals knowing they would be used to murder Kurds in

---

**38.** Plaintiffs contend that a knowledge standard, not a purpose standard, is the correct standard for aiding and abetting in ATS cases. Nevertheless, the Court will follow the Fourth Circuit's holding in Aziz that "purpose" is the correct standard, although other foreign and domestic courts, as well as scholars, express the opinion that "knowledge" is the appropriate mens rea. See, e.g., Doe v. Exxon Mobil Corp., No. CV 01-1357(RCL), 2015 WL 5042118, at *13–14 (D.D.C. July 6, 2015); Ingrid Wuerth, The Alien Tort Statute and

Federal Common Law: A New Approach, 85 Notre Dame L. Rev. 1931, 1943, 1951 (2010).

**39.** See Doe v. Exxon Mobil Corp., 2015 WL 5042118, at *9 (quoting Prosecutor v. Šainović, Case No. IT-05-87-A, Appeal Judgement, ¶ 1649 (ICTY Jan. 23, 2014))("The actus reus for aiding and abetting under customary international law is established by 'practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime.' ").

northern Iraq, but failed to allege that the defendants had anything to gain from the use of chemical weapons. Aziz, 658 F.3d at 394, 401. Thus, in Talisman and Aziz, the purpose standard was not satisfied because the defendants had nothing to gain from the violations of international law, and in Talisman, the violations actually ran counter to the defendants' interest. Here, however, the complaint alleges that the defendants obtained a direct benefit from the commission of the violation of international law, which bolsters the allegation that the defendants acted with the purpose to support child slavery.

Nestle USA, Inc., 766 F.3d at 1024.

Likewise, the allegations in the instant TAC provide sufficient facts to present a plausible inference that each Defendant acted with a purpose to support the nonconsensual Guatemala Experiments.

### (a) Hopkins

■ The TAC alleges multiple acts of substantial assistance taken by individual Hopkins "decisionmakers." For example:

- Dr. Turner sent at least 32 sets of infected rabbits from his lab at the Hopkins Department of Bacteriology to Guatemala to be used to infect subjects with syphilis. Turner instructed Cutler to inject subjects with T. cuniculi to test its pathogenicity and to send him data from the Experiments. ¶¶ 190, 191, 403, 418, 420.

- Dr. Moore designed the research protocols and tests to be used in the Guatemala Experiments and specifically targeted the vulnerable population groups used as subjects. Dr. Moore helped select Dr. Cutler and Dr. Soper to be in positions of authority in the Experiments. ¶¶ 174, 370 390, 391, 416.

- Dr. Reed was involved with defining, transmitting, and analyzing the data received from the Experiments. He worked with Dr. Cutler and the researchers in Guatemala to ensure the careful reporting of data and to provide support. ¶¶ 181, 182.

- Dr. Eagle used the Hopkins Lab of Experimental Therapeutics staff and resources to assist the researchers in the Experiments, and he shipped arsenic and bismuth, and the appropriate dosing schedules, to Guatemala to be used in the tests. ¶¶ 200, 201, 204.

These acts of direct material and logistical support and guidance, including sending the rabbits—the source of the harm— are clearly substantial acts of assisting in the nonconsensual human experimentation.

Furthermore, the TAC adequately alleges that the Hopkins personnel involved knew about the nonconsensual nature of the experimentation in the Experiments. The TAC states that Drs. Reed and Turner received data that included the location and ages of test subjects, thus they knew that at least some of them were incapable of consent. Dr. Moore identified the children, mentally ill patients, and others used as subjects, and knew they did not give informed consent. Furthermore, although Dr. Moore and others knew how to use informed consent procedures, as they did in the Terre Haute Experiments, they deliberately decided not to seek consent from the Guatemalan subjects.

The TAC also alleges that it was the Doctors' purpose to aid and abet the nonconsensual human experimentation.

Similarly to the Nestle defendants, Hopkins and its doctors obtained direct benefits from the nonconsensual nature of the Experiments. According to the TAC, Hopkins led the field in scientific research on

syphilis and received lucrative private and federal grants to conduct tests in that area. Hopkins, via Dr. Moore, had been involved in the Tuskegee and Terre Haute Studies, which left unanswered questions and received backlash in the United States, suggesting a motive to conduct secret experiments abroad. The TAC alleges that the Hopkins researchers needed a larger pool of human subjects and a covert test in order to run a scientifically-valid, large-scale experiment to learn about syphilis.

The Guatemala Experiments enabled Dr. Turner to further his research into T. cuniculi, Drs. Moore and Reed to know more about penicillin's effect on syphilis, and Dr. Eagle to further his Lab's research into arsenic and bismuth. By keeping the nature of the tests a secret from the subjects, the researchers were able to infect a large group of people quickly and avoid backlash from the public. These benefits "bolster[ ] the allegation that the defendants acted with the purpose to support [nonconsensual human experimentation]." Nestle, 766 F.3d at 1024.

The TAC sufficiently alleges that Hopkins aided and abetted violations of international law.

(b) Rockefeller

■■■ The TAC alleges actions taken on behalf of Rockefeller that present a plausible claim of substantial assistance to the Guatemala Experiments. These include the allegations that:

- Dr. Strode and Dr. Parran helped to plan and oversee the Experiments and the testing protocols, and keep the Rockefeller Foundation's Executive Committee and Scientific Directors informed of the Experiments.

- Dr. Parran met with Dr. Soper in 1946, informed him of the Guatemala Experiments, and asked him to serve as the "responsible investigator." When Soper agreed, Drs. Parran and Strode arranged for Dr. Soper to be assigned to the PASB by Rockefeller. Rockefeller paid Soper while he was on the PASB.

- Dr. Soper oversaw Dr. Cutler's work on the ground in Guatemala, traveled there several times, engaged in experiments, and reported back to Directors at Rockefeller. He also facilitated shipping infected rabbits from Rockefeller's labs.

- "Dr. Rolla E. Dyer, a Scientific Director of the International Health Division of The Rockefeller Foundation during the Guatemala Experiments, reviewed Dr. Soper's work annually and met with him [more than once] to discuss and offer advice on the Experiments." ¶ 428.

The TAC alleges that decisionmakers within Rockefeller knew of the Experiment's nature and that Rockefeller nevertheless had the purpose of furthering them because the Experiments benefited Rockefeller's public health research agenda. The Guatemala Experiments also advanced Rockefeller's joint research with Hopkins into STDs, and served as a continuation of the Tuskegee and Terre Haute Studies, with which Dr. Parran was involved. The TAC alleges that Dr. Soper knew that the test subjects did not give informed consent because he met with them when he visited Guatemala, and that he was chosen by Rockefeller not because he had experience in STD testing, but because it knew he would not report the unethical Experiments.[40]

40. The TAC also alleges that Parran knew about the nonconsensual nature of the Experi-

ments, and the TAC includes the following

These allegations present a plausible claim that Rockefeller had the purpose of assisting the human rights violations in Guatemala.

#### (c) Bristol–Myers Squibb

 The TAC alleges that the predecessors of Bristol–Myers Squibb substantially assisted the Guatemala Experiments by providing the penicillin used in the Experiments and guiding the course of the testing. Dr. Wintersteiner from Squibb helped select Dr. Cutler and Dr. Soper to carry out the Experiments. Dr. Kitchen met with Dr. Soper to discuss the Experiments and develop testing protocols. Bristol and Squibb scientists were provided to "fine-tune and oversee the use of penicillin in Guatemala" and "the researchers on the ground interacted with, and ultimately followed, the lead of B[r]istol and Squibb scientists." ¶ 458. Drs. Rake, Richardson, Kitchen, and Wintersteiner communicated with Dr. Moore and Dr. Cutler to discuss the levels of inoculation to be used. ¶ 423.

These Bristol–Meyers Squibb executives allegedly received and reviewed the data from the Experiments and thus knew that the testing was nonconsensual and that many of the subjects were incapable of consent. ¶¶ 257, 423. They also knew the timing and amounts of the dosages and knew when people were being inadequately treated, yet, this was essential to conducting their tests. According to the TAC, Bristol–Myers Squibb became involved with the Experiments because it was too costly and time-intensive to conduct clinical tests of penicillin G in the United States. ¶¶ 257, 258.

Like the defendants in Nestle, Bristol–Myers Squibb "sought a legitimate goal, profit, through illegitimate means, purposefully supporting [nonconsensual human experimentation]." Nestle USA, Inc., 766 F.3d at 1025–26. The data collected through the Experiments, not just any sale of the penicillin itself, was allegedly valuable to Bristol–Myers Squibb.

Therefore, the TAC sufficiently alleges a plausible claim that the Defendants aided and abetted the primary perpetrators.

#### ii. Conspiracy Liability

A conspiracy claim requires the same "substantial assistance" and "purpose" elements as an aiding and abetting claim, as well as the existence of an agreement and acts taken in furtherance of the agreement. See Talisman, 582 F.3d at 260 ("[P]laintiffs' conspiracy claims would require the same proof of mens rea as their claims for aiding and abetting.").

Defendants assert that the TAC fails to allege nonconclusory facts to plead the existence or terms of a conspiracy agreement.

 The TAC alleges that individuals at Johns Hopkins and Rockefeller had a history of working together on large-scale human experiments, and supported one another's projects. They allege that Dr. Moore and Dr. Parran, and others, developed the plan for the Guatemala Experiments, and selected Drs. Cutler and Soper (a Rockefeller employee) to implement the plan. ¶ 457. Bristol–Meyers Squibb allegedly joined the conspiracy and provided assistance. ¶ 458. All of the actions of these individuals were pursuant to the plan and protocol developed by the Doctors in the control group.

---

excerpt from a letter written in 1947 by a PHS researcher:

> As you well know, [Parran] is very much interested in the project and a merry twinkle came into his eye when he said, "You know, we couldn't do such an experiment in this country [America]."

¶ 429.

The TAC includes the following additional factual allegations supportive of the conspiracy claim:

- Drs. Moore, Reed, Turner, Eagle, and Weed were on the Syphilis Study Section, and they, along with Dr. Parran ("the control group") developed the plan for the Guatemala Experiments. ¶¶ 360–362.
- Dr. Kitchen met with Dr. Soper to discuss the Experiments, who they were going to be conducted on, details regarding penicillin G, and then helped to develop the testing protocols. ¶¶ 256, 401.
- Drs. Rake and Richardson attended a meeting of Dr. Moore's Subcommittee on Venereal Diseases at Hopkins and talked to Dr. Moore about the availability of penicillin for use in a large-scale experiment. ¶ 356.
- Dr. Wintersteiner was part of the Syphilis Study Section, and he, along with Drs. Rake and Richardson, were "brought into the fold" and told about the plan to conduct nonconsensual medical experiments on human subjects in Guatemala. ¶¶ 360, 363, 364.
- Dr. Cutler asked for his reports to be limited to the "control group." ¶ 436.
- After he left Guatemala for a job at Hopkins in 1950, Dr. Cutler continued to process data from the Experiments and met with and sent reports to Drs. Moore, Turner, Soper, and others. ¶ 444.
- Dr. Funes and Dr. Soper continued to supervise the Guatemala Experiments after 1950. Dr. Funes traveled to Baltimore for meetings with Hopkins employees and reported about the Experiment. ¶ 445.

These allegations, taken as true, are more than enough to support a plausible conspiracy claim. Unlike Twombly, in which the defendants' alleged actions were "more likely explained by, lawful, unchoreographed free-market behavior," here, because of the inherent unethical nature of nonconsensual experimentation, it is plausible that their alleged acts were taken pursuant to a conspiracy, rather than "uncoordinated independent action." Al-Quraishi v. Nakhla, 728 F.Supp.2d at 767 (quoting Iqbal, 556 U.S. at 680, 129 S.Ct. 1937).

Therefore, the TAC adequately alleges an ATS conspiracy.

3. Causation

■ Defendants contend that the TAC does not allege adequate facts to support a plausible claim that the Plaintiffs' diseases were caused by the Guatemala Experiments and not another source.[41]

The TAC alleges that the Guatemala Experiment test subjects were injected with syphilis from four sources, each carrying a different strain of the STD. Notably, one of the strains used in the injections—the Nichols strain—was a laboratory strain isolated and studied by researchers at Rockefeller Foundation and Johns Hopkins and had not been found in Guatemala. Many, if not most, of the Representative Plaintiffs in each Category tested positive for the Nichols strain. The distinct alleged tie between the Nichols strain and the Defendants makes plausible a claim that the Plaintiffs who contracted that particular strain of syphilis can trace their infections back to the Guatemala Experiments.

---

41. Specifically, Defendants reference reports which state that at least some of the subjects were treated with penicillin, and thus suppose that those treated could not have contracted syphilis and passed it on to their spouses or descendants.

The TAC affirmatively alleges that all of the Representative Plaintiffs were "not infected with syphilis through any means other than the Guatemala Experiments." See, e.g., ¶¶ 58, 66, 85, 91, 96, 110, 122, 129. The TAC also includes allegations about how each Plaintiff contracted syphilis. For example,[42]

### a. Direct Plaintiffs (Category 1)

- Francisco Garcia Alvarez, Plaintiff No. 349, tested positive for the Nichols strain of syphilis. He was imprisoned in a penitentiary in Guatemala City in 1947. "[T]wo men in white lab coats" entered his shared cell and "told the prisoners that they were going to give the prisoners injections of 'vitamins.' Over the course of three days, Mr. Alvarez was injected at least three times—once in the left arm, once in the left hip, and once in the right hip." ¶ 55. Two weeks later Mr. Alvarez notice unusual symptoms and has since suffered from "severe headaches, pain in his joints, joint swelling in his hands and knees, loss of vision, and lethargy." ¶ 56.

- Carlos Alberto Mendoza, Plaintiff No. 55, tested positive for the Nichols strain of syphilis. He attended a school in Puerto San Jose as a child. Two Caucasian, English-speaking doctors came to the school and gave him several injections on both sides of his shoulders. "After one series of injections, Mr. Mendoza became ill" and had a rash all over his body. ¶ 75. "Since then and over the course of his lifetime, Mr. Mendoza has experienced many symptoms caused by his syphilis. . . ." Id.

### b. Spouses (Category 2)

- Graciela Ortiz de Galvez, Plaintiff No. 64, tested positive for syphilis. She began experiencing syphilis symptoms since her marriage to Direct Plaintiff Ramiro Galvez in 1958. All of her children with Mr. Galvez have also tested positive for syphilis. Her two children from a previous marriage do not have syphilis.

### c. Descendants (Categories 3 and 4)

- Children: Lesbia Lucila Giron Galindo, Plaintiff No. 3, is the daughter of a Direct Victim and his wife. She was born with syphilis and has tested positive for the Nichols strain. Her father is identified in the papers of Dr. John Cutler as a participant in the human experimentation at Central Penitentiary. Before going to prison, her father was healthy. Ms. Galindo's older sister was born before their father was imprisoned, and is healthy and has never been diagnosed with syphilis or displayed any symptoms. ¶¶ 105–107.

- Grandchildren: Ronald Roberto Benavente Galvez, Plaintiff No. 70, is the grandson of Direct Plaintiff Ramiro Villalobos and his wife Graciela Ortiz de Galvez, and the son of Ebelin Galvez Ortiz. Mr. Benavente Galvez has tested positive for the Nichols strain of syphilis, like his grandparents, mother, and sister. He has suffered from symptoms of congenital syphilis, including deformity to his left arm, legs, and chest wall, from birth. ¶¶ 125–127.

These allegations temporally link the Representative Plaintiffs' onset of syphilis-like symptoms with the doctors administering injections, sexual contact with the Direct Plaintiffs, or from birth. The TAC

---

42. Although the TAC presents plausible allegations of causation as to each Representative Plaintiff, the Court shall discuss here only one or two illustrative Representative Plaintiffs per category.

presents nothing suggesting that the Plaintiffs, many of whom began experiencing the symptoms as minors, contracted syphilis from a source other than the Guatemala Experiments.

Accordingly, Plaintiffs have presented sufficient facts to state a plausible claim that at least some Plaintiffs in each category contracted syphilis as a result of the Guatemala Experiments. Whether Plaintiffs can prove the claimed causation shall, of course, be tested at a later stage of the case.

### 4. Preconception Torts Under the ATS

Defendants contend that all claims asserted by the descendants of the Direct Plaintiffs must be dismissed because "preconception torts" are not cognizable under the ATS. Defendants correctly observe that no federal court has imposed liability for a "preconception tort" of the type here presented.

The parties dispute whether this issue is governed by, as Defendants contend, customary international law, or, as Plaintiffs assert, federal common law or domestic law. As discussed herein with regard to the corporate liability standard, the Court will follow the rationale of the Ninth Circuit and look to domestic or federal common law for rules of causation and scope of liability. Cf., Doe v. Nestle, 766 F.3d at 1022 ("Thus, when questions endemic to tort litigation or civil liability arise in ATS litigation—such as damages computation, joint and several liability, and proximate causation—these issues must be governed by domestic law."). It is not necessary for the law of nations to recognize a "preconception tort."

■■■. In regard to federal common law, the Court may adopt the law of a forum state, or create a more uniform rule if one is required. See United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 99 S.Ct.

1448, 59 L.Ed.2d 711 (1979) (quoting United States v. Standard Oil Co., 332 U.S. 301, 310, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947)) ("Whether to adopt state law or to fashion a nationwide rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of specific governmental interests and to the effects upon them of applying state law.' ").

The tort and injuries involved in this case present issues of first impression. State and federal decisions addressing harm caused to a child due to a negligent action taken against the child's parent before conception do not adequately address an intentional tort committed against a person where the harm to the person's progeny is foreseeable and expected. E.g., Albala v. City of N.Y., 54 N.Y.2d 269, 445 N.Y.S.2d 108, 429 N.E.2d 786, 788–89 (1981)(declining to recognize a cause of action for preconception tort in malpractice claim against doctor); Deters v. Eli Lilly & Co., No. 89–2853 (D. Md. May 28, 1991)(dismissing a negligence action brought against a drug company by the daughter and granddaughter of a woman who ingested a drug that later caused birth defects to the woman's daughter and eventual granddaughter); Lynch v. Scheininger, 162 N.J. 209, 744 A.2d 113, 115 (2000)(involving negligence suit against doctor); Renslow v. Mennonite Hosp., 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250, 1255 (1977)(upholding action asserted by mother against doctor for negligent blood transfusion that harmed her child conceived years later). Even though New York and Maryland have rejected preconception negligence torts in the past, the decisions in those cases do not preclude liability in the case of a preconception intentional tort, nor does this Court think they indicate what a Maryland state court would today decide.

The parties' discussion of the preconception tort issue deals with the issue as one of "duty." The concept of "duty"—and attendant principles of proximate cause, scope, and foreseeability—are relevant to claims rooted in negligence, and are not particularly applicable when intentional injury is inflicted, as occurred here. The Restatement (Second) of Torts states: "Where a person has intentionally invaded the legally protected interests of another, his intention to commit an invasion, the degree of his moral wrong in acting, and the seriousness of the harm which he intended are important factors in determining whether he is liable for resulting unintended harm." Restatement (Second) of Torts § 435B· (1965). Comment· (a) to § 435B explains that the rule "is based upon the principle which ·underlies· both rules, namely, that responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one ·who is merely negligent or is not at fault." Comment (a) to Restatement (Second) of Torts § 435B (emphasis added).

The International Legal Panel on Corporate Complicity in International Crimes addressed the distinction between intentional and negligent conduct, stating,

> [T]he Panel has found that where a company acted intentionally, across jurisdictions, causation will become a less complicated matter and the courts will take a more flexible approach. It will often be the case that a course of conduct. which was undertaken with the intention of contributing to the infliction of harm will be considered a cause of the ·harm even though for example the conduct may be very distant in the chain of causation from the harm.

Int'l Comm'n of Jurists, 3 Corporate Complicity & Legal Accountability 27 (2008)(emphasis added)(footnote omitted).

 Under the circumstances alleged in the TAC, the Court concludes that the claims asserted by Children and Grandchildren Plaintiffs under the ATS are plausibly presented. The Court draws this conclusion from the rationale of the majority of state courts [43] that have recognized preconception torts in negligence suits, where it is important to limit the scope of liability based on proximate cause and duty. In one such case, Renslow v. Mennonite Hospital, 67 Ill.2d 348, 10 Ill. Dec. 484, 367 N.E.2d 1250 (1977), the Supreme Court of Illinois noted that it had "long recognized that a duty may exist to one foreseeably harmed though he be unknown and remote in time and place." Id., 10 Ill.Dec. 484, 367 N.E.2d at 1254–55 (emphasis added)(citations omitted). "Foreseeability," according to another court in a preconception tort case, "embodies an element of awareness or knowledge on the part of the tortfeasor that the class of persons represented by the plaintiff were at risk as a result of the tortfeasor's conduct." Taylor by Taylor v. Cutler, 306 N.J.Super. 37, 703 A.2d 294, 299 (App. Div. 1997), aff'd in part sub nom. Taylor· ex rel. Taylor v. Cutler, 157 N.J. 525,· 724 A.2d 793 (1999). According to Plaintiffs' allega-

---

**43.** "Most jurisdictions that have addressed the question have permitted preconception tort actions. Among those permitting preconception tort actions are Jorgensen v. Meade Johnson Laboratories, Inc., 483 F.2d 237 (10th Cir. 1973) (construing Oklahoma law); Bergstreser v. Mitchell, ·577 F.2d 22 (8th Cir. 1978) (construing Missouri law); Renslow v. Mennonite Hospital, 67 Ill.2d 348, 10 Ill.Dec. 484,·367 N.E.2d 1250 (Ill. 1977); Monusko v. Postle, 175 Mich. App. 269, 437 N.W.2d 367 (1989); Hegyes v. Unjian Entp., Inc., 234 Cal. App.3d 1103, 286 Cal.Rptr. 85 (2nd Dist. 1991); and Walker v. Rinck, 604 N.E.2d 591 ·(Ind. 1992)." Lough by Lough v. Rolla Women's Clinic, Inc., 866 S.W.2d 851, 853 (Mo. 1993).

tions, the Defendants in this case certainly were aware that the Descendants of the Direct Victims, as a class, were at risk as a result of Defendants' conduct.

The Court recognizes that it would be inappropriate to conclude that the chain of causation should stretch ad infinitum. As stated by the Renslow Court,

> The [negligent] damage alleged is not, by its nature, self-perpetuating, nor is the plaintiff a remote descendant. We feel confident that when such a case is presented, the judiciary will effectively exercise its traditional role of drawing rational distinctions, consonant with current perceptions of justice, between harms which are compensable and those which are not.

10 Ill.Dec. 484, 367 N.E.2d at 1255. Indeed, there are many intervening and superseding causes that could theoretically break the chain of causation for a particular plaintiff.[44] The alleged facts in this case are unique and unlikely to be repeated, so the judiciary need not fear an upsurge of cases involving multiple generations of plaintiffs and harms caused by actions committed decades ago.

Accordingly, the Court denies the contention that ATS claims of the "Children" and "Grandchildren" Plaintiffs must be dismissed as not cognizable under the ATS.

### D. Guatemalan Law Claims (Count II)

In Count II of the TAC, all Plaintiffs assert claims under Guatemalan law, particularly Section 2277 of the 1933 Guatemalan Civil Code and Sections 1645 and 1646 of the 1963 Guatemalan Civil Code.

A federal court sitting in diversity applies the conflict of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Maryland adheres to the principle of lex loci delicti in tort cases, and therefore applies the substantive law of the place where the tort was committed, which in this case is alleged to be Guatemala. Lab. Corp. of Am. v. Hood, 911 A.2d 841, 844–45 (Md. 2006). Maryland also follows the First Restatement of Conflicts of Laws for lex loci delicti issues. Id. at 845.

Rule 44.1 of the Federal Rules of Civil Procedure provides:

> In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

The Court's analysis of Guatemalan law is aided by the declarations of several experts on Guatemalan law, as well as other materials and Guatemalan case law submitted by the parties.

#### 1. The Applicable Code

The law in force in Guatemala at the time of the Guatemala Experiments was the Civil Code of 1933 ("1933 Civil Code"). This Code was later replaced by the Civil Code of 1963 ("1963 Civil Code"), which is the current Code. There are key differences between the two Codes that have a direct bearing on the issues in the instant case, thus the Court must decide which Code applies to which Plaintiffs' claims.

---

44. Hypothetically, in the instant case, the chain of legal causation could have been broken if Direct Plaintiffs (or their Spouses) had, after being infected with syphilis, known of their disease and its contagious qualities, and yet deliberately passed the disease to others without taking any sort of precautions. However, that is not the situation alleged in the TAC.

The parties agree that the 1933 Civil Code applies to claims brought by Plaintiffs born before 1964. Plaintiffs contend, however, that the 1963 Civil Code applies to all claims asserted by Plaintiffs born after that Code went into effect in 1964.

Article 15 of the Guatemalan Constitution of 1985 states, "The law has no retroactive effects except in criminal matters when it favors the defendant."

In addition, the Court accepts the expert opinion of Prof. Keith S. Rosenn, who states that the Guatemalan Supreme Court and its Constitutional Court apply the principle of tempus regit actum,[45] which means that "acts are governed by the laws in force at the time in which they occurred." Rosenn Decl. [ECF No. 63–2] ¶ 25; see also Gomez Decl. [ECF No. 63–3] ¶¶ 15, 16, 18. This principle is relied upon by the Supreme Court of Justice in Guatemala. In one case that Court stated:

> [C]ase law enshrines the principle "Tempus regit actum," meaning that all events in law, be they accidental or willful, are regulated in form and substance as well as in their effects by the law in force when the event occurs, such that every act producing a legal effect under the old law remains in full force under the new, and no act that was denied an effect under the old law can be granted that effect under the new law.

Maria Teresa Ruiz Najera v. Jorge Efrain de Leon Ruiz and Ana Maria del Rosario Deleon Chavarria, Supreme Court of Guatemala, Civil Chamber, 24 July 1975, Gaceta de los Tribunales [ECF No. 71–1] at 85.

Article 2180 of the 1963 Civil Code provides:

> Conflicts in the application of contradictory provisions between prior laws and what is set out in this Code shall be resolved in accordance what is provided

in the Constitutive Law of the Judiciary, especially in what is directed by Article 250 of this Law, except for prescription which shall be that set out in the Law in effect at the time the obligation was contracted.

Civil Code (Guatemala) art. 2180, Decreto–Ley numero 106, September 14, 1963 [hereinafter, "1963 Civil Code"](emphasis added).

Plaintiffs' experts offer no argument to support their assertion that the 1963 Civil Code, other than with regard to its prescription period, should apply to the claims of Plaintiffs born after 1964.

Indeed, Plaintiffs' expert, Prof. Alejandro Garro, states that the "first sentence of Article 2277 of the 1933 Guatemalan Civil Code is the cause of action on which the liability of the defendants allegedly rests . . . ." Garro Aff. [ECF No. 76–1] ¶ 34. His analysis of the legal issues, even those issues applying to the Descendant Plaintiffs born later, is based upon provisions of the 1933 Civil Code. See Garro 3rd Decl. [ECF No. 115–2] ¶¶ 9–11 (discussing causation and preconception torts).

Moreover, the Court would find it unsound to conclude that a lawful action taken in 1946 can be retroactively rendered tortious by a statute passed seventeen years thereafter.

■ Therefore, the Court finds that the tort law in the 1933 Civil Code—the Code in effect at the time of the allegedly tortious actions—governs the matter of liability on all Plaintiffs' Guatemalan law claims.

### 2. Employer Vicarious Liability

The parties dispute whether the 1933 Civil Code recognizes respondeat superior

---

**45.** Translated literally to "time governs the act."

or otherwise imputes vicarious liability on employers generally.

The tort provision providing the cause of action, Article 2277 of the 1933 Civil Code, provides:

Whoever, due to his or her actions, negligence or imprudence causes harm to another is obligated to make reparations.

A father, or in his absence a mother, is equally liable for any injury caused by children under their parental authority.

A keeper is liable for any injury caused by the minors or handicapped individuals he has under his care.

A master craftsman for damages caused by his apprentices.

And in general, anyone who has others under his care, for any damages they may cause.

Civil Code (Guatemala), Decreto Legislativo numero 1932, May 13, 1933 [hereinafter, "1933 Civil Code"].

Defendants assert that this list imposes vicarious liability in certain situations, but does not make employers liable for the actions of their employees. See Rosenn Supp. Decl. [ECF No. 107–2] ¶¶ 12–13; Gomez Supp. Decl. [ECF No. 107–3] ¶¶ 3–5. Plaintiffs contend that the last paragraph in Article 2277—the "catch-all" provision—is a textual basis for vicarious liability for employers. Garro Supp. Decl. [ECF No. 110–6] ¶¶ 4(f), 27. However, the Court agrees with Defendants' expert Manuel A. Gomez, who declares that, "the term 'under their care' contained in article 2277 of 1933 Civil Code referred to a residual category of relationships between individuals and those subject to their watch, and could not be interpreted to include, for instance, the relationship between an employer and their employee. . . ." Gomez Supp. Decl. [ECF No. 107–3] ¶ 5 (footnote omitted). Employees, unlike children, or the others listed, do not have a diminished capacity such as to place them "under the care" of the employer. Id.

Additionally, the Court notes that the Guatemala Law of Accidents (Legislative Decree 1827 of May 6, 1932), in effect during the 1940s, imposed civil liability on common carriers and power companies for injuries caused by the negligence of their employees. See Rosenn Supp. Decl. [ECF No. 107–2] ¶ 9. In addition, Article 43 of the 1936 Penal Code, also imposed vicarious liability on the "heads of households, teachers, and persons dedicated to whatever type of industry, for the crimes by their servants, disciples, apprentices or dependents, in the performance of their obligations and services." See id. ¶ 10. These statutes would not have been necessary had the 1933 Code in general imposed vicarious liability on employers for their employee's actions and demonstrate that the Guatemalan legislature would specifically provide for vicarious liability when it chose to impose it. See id.; Gaitan Supp. Decl. [ECF No. 107–4] ¶ 5(b).

The 1963 Civil Code, which does impose civil vicarious liability on employers, provides an example of the language used to do so:

Employers and owners of shops, hotels, commercial or industrial establishments, and in general, people that have others under their dependency are liable for the damages or prejudice caused by their employees and other workers in acts of service.

1963 Civil Code art. 1663.

Plaintiffs' arguments in favor of vicarious liability are not compelling. Plaintiffs' expert witness, Prof. Garro asserts that an employer's vicarious liability for their employees "is premised, in most civil law systems, on a presumption that employer had been negligent in the selection (culpa in eligendo) or supervision (culpa in vigi-

*lando)* of the acts of their employees." Garro 3rd Decl. [ECF No. 115–2] ¶ 16. Plaintiffs do not allege such a claim in the TAC.

■ Additionally, Plaintiffs cite to one case from the Supreme Court of Guatemala, decided in 1958, in which the Court affirmed the liability of the Guatemalan Government for allowing U.S. military personnel to dig a canal on a private citizen's land in violation of the law of expropriation. See id. ¶ 18 (citing Rosa Romero Viuda de Petrilli v. Estado de Guatemala, Supreme Court of Guatemala, Civil Chamber, 27 March 1958, Gaceta de los Tribunales). Plaintiffs' expert contends that this case provides an example of the Court using Article 2277 of the 1933 Civil Code to impose vicarious liability on an employer for the acts of employees. Although it is true that the Court listed Article 2277 as one of the several provisions violated, the decision does not mention employer liability, vicarious liability, or anything that sheds light on this issue. The fact that this was a case against the Guatemalan State, not a private employer, also makes it distinguishable from the case at hand, particularly since Article 24 of the Guatemalan Constitution of 1945, cited by the Court, makes officials civilly liable for their transgressions, and makes the State, "subsidiarily responsible for the consequent damages and injuries."

Accordingly, the Court concludes that the 1933 Civil Code did not provide for vicarious liability for employers in the types of scenarios as alleged in the instant case.

Without a legal basis for imposing liability on Defendants for the acts of their purported agents, the Guatemalan tort claims cannot stand.

Therefore, all claims in Count II shall be dismissed.

### E. "Estate" and "Wrongful Death" Plaintiffs

#### 1. Estate Plaintiffs

The Estate Plaintiffs present ATS and Guatemalan law claims on behalf of deceased victims of the Guatemala Experiments. The claims of the Estate Plaintiffs are being brought by the decedents' "heirs, next of kin, or personal representative." ¶ 152. Defendants contend that the Estate Plaintiffs do not have standing to sue because, under Guatemalan law, a decedent's "successors" can present a survivorship claim only after going through the judicial process to be declared "heirs." See Rosenn Supp. Decl. [ECF No. 107–2] ¶ 21.

The ATS is silent on a party's right to assert a claim based on injury to another person. Thus the Court must look to analogous state or federal statutes. See Wilson v. Garcia, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Federal Rule of Civil Procedure 17(b) provides that capacity to sue, in the case of a person acting in a representative capacity, is determined "by the law of the state where the court is located," which in this instance is Maryland.

Maryland law provides that a "personal representative" may commence a personal action for a decedent "which the decedent might have commenced or prosecuted." Md. Code Ann., Est. & Trusts § 7–401(y)(1). Generally under Maryland law, a "personal representative," which includes "an executor or administrator but not a special administrator," may act "upon the issuance of his letters," [46] but "[a] foreign

---

46. " 'Letters' include letters testamentary and letters of administration." Md. Code Ann., Est. & Trusts § 1–101(n).

personal representative is not required to take out letters in the State." Id. § 1–101(q); § 5–501. "Any foreign personal representative may exercise in Maryland all powers of his office, and may sue and be sued in Maryland, subject to any statute or rule relating to nonresidents." Id. § 5–502(a).

In Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C., 693 F.Supp.2d 4 (D.D.C. 2010), the court looked to Iraqi law to determine how heirs of a decedent could become personal representatives, and determined the Estate plaintiff had standing because the Estate proffered to the court that it had the proper documentation showing that the Estate became the personal representative under Iraqi law and that it would provide the documents in the course of discovery. Id. at 16–17.

Guatemala does not recognize "estates" as 'a concept; instead, "any civil action for liability that stems from commission of a crime or infraction passes directly to heirs, as does any civil liability that the deceased may have owed to the victim or [sic] a crime." Rosenn Supp. Decl. [ECF No. 107–2] ¶ 24.

According to Prof. Keith S. Rosenn, "w[h]en a person dies intestate, the presumptive heirs are called before a judge." Id. ¶ 31.

> An heir expressly accepts the inheritance by explicitly doing so before the judge, by formally requesting possession of assets of the decedent, or by using the title of heir in a public act or instrument. Art. 916 of the 1933 Civil Code; Art. 1027 of the 1963 Civil Code. An heir accepts the inheritance tacitly by taking possession of his or her inherited property or by performing other acts which can only be carried out by the heir. Art. 916 of the 1933 Civil Code; Art. 1028 of the 1963 Civil Code.

Id.

In their Opposition, Plaintiffs contend that "[u]nder Guatemalan law, establishing oneself as a legal 'heir' under Guatemalan law is a ministerial act that can be performed at any time, and should not act as a requisite to any of Plaintiffs' claims." Pls.' Opp'n [ECF No. 139] at 89.

Whether each "Estate" Plaintiff has standing to sue as an "heir" as defined by Guatemalan law depends on the facts unique to that Plaintiff, including whether the decedent died intestate, if the heir accepted his or her status expressly or tacitly, and so on. The ability of each Estate Plaintiff to sue shall be resolved in the course of the litigation. The Court shall not dismiss claims by Estate Plaintiffs for lack of standing.

### 2. "Wrongful Death" Plaintiffs

 Wrongful Death Plaintiffs (parents, spouses, or children of the decedents) bring claims under the ATS, Guatemalan law, or "analogous state law," for damages they sustained due to the loss of their decedent family members whose death was caused by syphilis obtained from the Guatemala Experiments. ¶ 555. The TAC identifies eight Representative Wrongful Death Plaintiffs, provides the relationship between the decedent and the beneficiary claimant, and alleges that the decedent contracted syphilis and died as a result of the Experiment. See ¶¶ 151, 54.

Federal courts have allowed relatives of decedents to sue under the ATS.[47]

---

47. See, e.g., Baloco ex rel. Tapia v. Drummond Co., 640 F.3d 1338, 1344–45 (11th Cir. 2011)(holding that children had a claim cognizable under the ATS for the assassination of their fathers); Bowoto v. Chevron Corp., 621 F.3d 1116, 1124 (9th Cir. 2010)(stating that another federal statute did not preempt all ATS wrongful death claims); Xuncax v. Gra-

■ The ATS is silent on wrongful death actions, so courts look to the analogous Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, for direction. E.g., Beanal v. Freeport–McMoRan, Inc., 969 F.Supp. 362, 368 (E.D. La. 1997), aff'd, 197 F.3d 161 (5th Cir. 1999). The TVPA "suggests looking to state law for 'guidance' regarding which parties would be proper wrongful death claimants, and permits suit 'by the victim or the <u>victim's legal representative or a beneficiary in a wrongful death action.</u>'" <u>Sikhs for Justice Inc. v. Indian Nat'l Cong. Party</u>, 17 F.Supp.3d 334, 346 (S.D.N.Y. 2014)(emphasis added)(quoting S. Rep. No. 102–249 at *7 (1991)), aff'd sub nom. <u>Sikhs for Justice, Inc. v. Nath</u>, 596 Fed.Appx. 7 (2d Cir. 2014); see also <u>Baloco</u>, 640 F.3d at 1349 ("[S]tate law should govern the determination of whether a plaintiff is a claimant in an action for wrongful death and, where state law would provide no remedy, a court may apply the foreign law that would recognize the plaintiff's claim."). Thus, a person who is a wrongful death beneficiary under Maryland law may recover for wrongful death under the ATS.

■ Maryland law provides that "[t]he primary beneficiaries of a wrongful death action are the spouse, parent, and child of the decedent." <u>Spangler v. McQuitty</u>, 449 Md. 33, 141 A.3d 156, 165 (2016)(citing Cts. & Jud. Proc. § 3–904(a)(1)). Therefore, the Representative Wrongful Death Plaintiffs who are the spouses, parents, or children, of the decedents have standing to assert wrongful death claims under the ATS.

The Wrongful Death Plaintiffs claims shall not now be dismissed.

majo, 886 F.Supp. 162, 191–92 (D. Mass. 1995)(holding that, under Guatemalan law, the deceased's sibling had standing to assert a cause of action under ATS for the execution

## IV. CONCLUSION

For the foregoing reasons,

1. Defendants' Motion Under Federal Rules of Civil Procedure 12(b)(1) and (6) to Dismiss the Third Amended Complaint [ECF No. 133] is GRANTED IN PART and DENIED IN PART.

 a. Plaintiffs' ATS claims in Count I remain pending against all Defendants. There remain pending:

 i. Claims of Direct Victims.

 ii. Claims of Spouses.

 iii. Claims of Children.

 iv. Claims of Grandchildren.

 v. Claims of Wrongful Death Plaintiffs.

 vi. Claims of Estate Plaintiffs.

 b. All Plaintiffs' Guatemalan law claims in Count II shall be DISMISSED.

2. Plaintiffs shall arrange a case planning conference to be held by September 15, 2017.

SO ORDERED, this <u>Wednesday, August 30, 2017.</u>

of her sister, but could not recover for claims of torture); <u>Filartiga v. Pena–Irala</u>, 630 F.2d 876, 878 (2d Cir. 1980).